**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NANO DIMENSION LTD., | Case No: 1:23-cv-02566 |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1. **Violation of Exchange Act Section 13(d), 15 U.S.C. § 78m(d) (Failure to File Schedule 13D)** |
| MURCHINSON LTD., EOM MANAGEMENT LTD., NOMIS BAY LTD., BPY LIMITED, ANSON ADVISORS INC., ANSON FUNDS MANAGEMENT LP, ANSON MANAGEMENT GP LLC, BOOTHBAY FUND MANAGEMENT, LLC, BOOTHBAY ABSOLUTE RETURN STRATEGIES, LP and BOOTHBAY DIVERSIFIED ALPHA MASTER FUND, LP, | 2. **Violation of Exchange Act Section 13(d), 15 U.S.C. § 78m(d) (False and Misleading Schedule 13D)** |
| | 3. **Breach of Contract** |
| | 4. **Tortious Interference with Business Relations** |
| | 5. **Unjust Enrichment** |
| Defendants. | **JURY TRIAL DEMANDED** |

J. Noah Hagey, Esq.
Jonathan Kortmansky, Esq.
Melissa Ginsberg, Esq.
**BRAUNHAGEY & BORDEN LLP**
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403
Facsimile: (415) 276-1808
hagey@braunhagey.com
kortmansky@braunhagey.com
ginsberg@braunhagey.com

*Attorneys for Plaintiff Nano Dimension Ltd.*

Plaintiff Nano Dimension Ltd. ("Nano"), alleges against Defendants Murchinson Ltd., EOM Management LTD, Nomis Bay Ltd., and BPY Ltd. (together, "Murchinson"), Boothbay Fund Management, LLC, Boothbay Absolute Return Strategies LP and Boothbay Diversified Alpha Master Fund, LP (together, "Boothbay"), and Anson Advisors Inc., Anson Funds Management LP, and Anson Management GP LLC (together, "Anson") as follows:

## INTRODUCTION

1.      Plaintiff Nano is a revolutionary 3D printing company with more than 500 employees in the United States, Israel, Switzerland, the United Kingdom, the Netherlands, and Australia.  It brings this action to halt Defendants' scheme to manipulate the public trading of Nano's stock in violation of U.S. securities laws and at the expense of the company, innocent investors, and employees.

2.      Defendants are a consortium of hedge fund short-sellers who conspired to obtain a large stake in Nano by working in tandem to lower the price of the company's public securities in order to buy them for themselves.  Their playbook is simple: they find a promising company like Nano that has attracted significant investment, furtively acquire a large position, and then seek to dismantle the company and distribute its cash for Defendants' own benefit.  Such conduct violates numerous securities and legal strictures and has caused Defendants to be named as defendants in actions brought by the U.S. Securities and Exchange Commission and other government and private organizations.

3.      Nano has traded on NASDAQ through American Depository Shares ("ADSs") for seven years.  Between 2020 and 2022, Nano's annual revenues grew by over 1,180% and investors lined up to invest, helping the company raise substantial cash to fund its development and expansion efforts.

4.      Beginning in 2022, Defendants began targeting Nano by manipulating the price and market for Nano ADSs, acquiring a large undisclosed interest, and ultimately mounting a bid for control. They did so in violation of SEC regulations that require investors (or coordinated groups of investors) to disclose when they acquire beneficial ownership of 5% or more of a company's shares.  The regulations exist to protect other investors and the issuers from stock price manipulation and creeping takeover attempts.  Defendants failed to make the disclosures in order to avoid regulatory and investor scrutiny.  Defendants then attempted to use their newly-acquired ownership of Nano securities to raid the company.

5.      On approximately September 5, 2022, Murchinson made a sudden non-binding offer to purchase Nano, stating that it already owned more than 10 million company ADSs, reflecting approximately 4% of Nano's outstanding stock.  On September 7, 2022—just two days later—Anson and Boothbay executed two large purchases within a matter of minutes.  The September 7 trades totaled 1.86 million shares, a value of more than $4.5 million.  Murchinson's offer was, at this point, supposed to be confidential.  But the trades were not a coincidence:  they were designed for Anson and Boothbay to profit off the non-public material information that Murchinson had made an offer to purchase Nano, and to further increase Defendants' holdings in the company before news of the offer became public.

6.      Nano's Board of Directors rebuffed Defendants' offer, which was premised on Defendants' illegal share manipulations and was contrary to the long-term interests of shareholders.  In response, in late 2022 and spanning into 2023, Defendants launched a public smear campaign against Nano and its management, driving down Nano's share price so that Defendants could acquire even more shares at artificially reduced prices. Defendants again violated U.S. securities law disclosures designed precisely to alert the market to such activity.

Defendants ultimately acquired cumulative ownership interests in Nano above 10% and continue to seek to overthrow the company's Board and wrest control from its managers.

7.      Nano seeks to prevent Defendants from engaging in further misuse of their improperly acquired interests, and to compensate Nano for Defendants' misconduct—including by disgorging Defendants' shares and profits wrongfully earned through unlawful trades, breaches of contract, and tortious interference with Nano's business relationships.

## THE PARTIES

8.      Plaintiff Nano Dimension Ltd. is an Israel-based manufacturer with operations in Israel, the United States, Switzerland, the United Kingdom, the Netherlands, and Australia. Nano's portfolio solutions include additively manufactured electronics ("AME"), printed electronics, micro additive manufacturing, artificial intelligence deep learning, surface-mount technology, and inkjet solutions. It is based at 2 Ilan Ramon Street, Ness-Ziona Science Park, Ness Ziona, HaDarom, Israel 7403635. Nano's ADSs trade on NASDAQ in New York under the ticker symbol "NNDM."

### A.      The Murchinson Defendants

9.      Defendant Murchinson Ltd. is a Toronto-based hedge fund founded in 2012 and controlled by Marc Bistricer.  Murchinson is registered in New Jersey, with a registered agent listed as Chaim Bodner and a mailing address 35 Laurel Ave, Clifton, New Jersey 07012. According to its March 6, 2023 Schedule 13D filed with the SEC, Defendant Murchinson Ltd. is the sole beneficial owner of 6,747,938 American Depository Shares ("ADSs") of Nano and the shared beneficial owner of an additional 6,747,939 ADSs of Nano.

10.      Murchinson owns and controls the ADSs of Nano through several entities under its control, including Defendants EOM Management LTD ("EOM"), Nomis Bay Ltd. ("Nomis"), and BPY Limited ("BPY").

11.     Defendant EOM Management Ltd ("EOM") is a hedge fund manager controlled by Murchinson Ltd. that operates Murchinson's private funds. According to Murchinson Ltd.'s March 6, 2023 Schedule 13D, EOM is the beneficial owner of 6,747,939 ADSs of Nano. SEC filings identify EOM's address as 51 Church Street, 5th Floor, Hamilton, Bermuda HM 12.

12.     Defendant Nomis Bay Ltd. ("Nomis") is a hedge fund operated by EOM and controlled ultimately by Murchinson Ltd. According to Murchinson Ltd.'s March 6, 2023 Schedule 13D, Nomis is the beneficial owner of 4,048,763 ADSs of Nano.  Nomis's public filings with the SEC identify its offices as Wessex House, 3rd Floor, 45 Reid Street, Hamilton, Bermuda HM 12.

13.     Defendant BPY Limited ("BPY") is a hedge fund operated by EOM and controlled ultimately by Murchinson Ltd. According to Murchinson Ltd.'s March 6, 2023 Schedule 13D, BPY is the shared beneficial owner of 2,699,176 ADSs of Nano.  BPY's public filings with the SEC identify its offices as Wessex House, 3rd Floor, 45 Reid Street, Hamilton, Bermuda HM 12.

14.     Defendants Murchinson Ltd., Nomis, BPY, and EOM are collectively referred to as "Murchinson."

**B.     The Boothbay Defendants**

15.     Defendant Boothbay Fund Management, LLC, ("Boothbay Management") is an investment advisor firm with its office at Two Grand Central Tower, 140 E 45th St., 14th Floor, New York, NY 10017.

16.     Boothbay Management is the owner of at least 5,238,542 ADSs of Nano, as reflected on its Form 13F for the period ending December 31, 2022.

17.     Boothbay Management owns these shares through entities that its owns and controls including two hedge funds it operates: Boothbay Absolute Return Strategies LP and Boothbay Diversified Alpha Master Fund, LP.

18.     Boothbay Absolute Return Strategies LP's public filings with the SEC state that it is a Delaware Corporation with its principal place of business located at 140 East 45th Street, New York, NY.

19.     On information and belief, Boothbay Diversified Alpha Master Fund also has a principal place of business located at 140 East 45th Street, New York, NY.

20.     Defendants Boothbay Management, Boothbay Absolute Return Strategies LP and Boothbay Diversified Alpha Master Fund, LP are collectively referred to herein as "Boothbay."

21.     Boothbay is closely aligned with Murchinson with respect to its investment in Nano.  Murchinson controls Boothbay's investment in Nano and acts as Boothbay's legal agent, as disclosed in Murchinson's purported "Notice of Special General Meeting of [Nano] Shareholders" dated February 13, 2023, which was signed by Boothbay Absolute Return Strategies LP and Boothbay Diversified Alpha Master Fund, LP "pursuant to Power of Attorney granted to Murchinson Ltd."

22.     Boothbay's close relationship with Murchinson extends beyond their coordination with respect to Nano.  Boothbay is an advisor to two of Defendant Murchinson's private funds, Fund #8 and Fund #9, according to Murchinson's November 18, 2022 Form ADV.

C.     **The Anson Defendants**

23.     Defendant Anson Advisors Inc. ("Anson Advisors") is a private asset management firm and an advisor to several investment funds (the "Anson Funds").  Anson Advisors' public filings identify its offices at 155 University Ave, Suite 207, Toronto, ON, M5H 3B7. Anson Advisors' CEO is Moez Kassam and its Secretary and Chief Compliance Office is

Amin Nathoo. Anson Advisors is the beneficial owner of 13,252,136 ADSs of Nano, according to the March 10, 2023 Schedule 13D filed by Anson Funds Management LP.

24.     Anson Advisors owns and controls these Nano ADSs through several entities under its control, including Defendants Anson Funds Management LP ("Anson Management") and Anson Management GP LLC ("Anson GP").

25.     Defendant Anson Funds Management LP is an investment fund manager of the Anson Funds.  Anson Management's public filings identify its address as 16000 Dallas Parkway, Suite 800, Dallas, TX 75248. Anson Management is the direct owner of 13,252,136 Nano ADSs, according to the March 10, 2023 Schedule 13D that it filed with the SEC.

26.     Defendant Anson Management GP LLC ("Anson GP") is the General Partner of Anson Management. On information and belief, Anson GP is located at 16000 Dallas Parkway, Suite 800, Dallas, TX 75248.  Anson GP is the beneficial owner of the same 13,252,136 Nano ADSs, according to the March 10, 2023 Schedule 13D filed by Anson Funds Management LP.

27.     Defendants Anson Advisors, Anson Management, Anson GP, and the Anson Funds are collectively referred to herein as "Anson."

28.     In total, Anson is the beneficial owner of 13,252,136 shares of Nano ADS, according to its March 9, 2023 Schedule 13D.

**D.     Defendants' Conspiracy**

29.     As detailed below, Murchinson, Anson, and Boothbay conspired and acted together to manipulate the price of Nano's ADSs and secretly acquire more than 10% of Nano's shares in an effort to seize control of the company and raid its assets. In furtherance of this scheme, Defendants evaded disclosure requirements by failing to disclose the existence and purpose of their group as legally required and by filing false and misleading regulatory disclosures with the SEC.

30.     Upon information and belief, Defendants coordinated these efforts and intentionally violated their disclosure obligations in order to allow themselves to amass a large stake in Nano without alerting other shareholders, investors, or the company regarding the true nature of their plans.

31.     Murchinson, Anson, and Boothbay's conduct alleged in this Complaint is part of a joint conspiracy in which each of Murchinson, Anson, and Boothbay, and each of their affiliates, aided and abetted the conduct of the other, acting as each other's agents and co-conspirators. Further details regarding each Defendant's participation and assistance in the conspiracy are uniquely within Defendants' possession, custody and control.

## JURISDICTION AND VENUE

32.     Subject matter jurisdiction of this Court is proper pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa.

33.     Personal jurisdiction over all Defendants is also proper in this Court pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa and New York C.P.L.R. § 302(a). Defendants have acted and transacted business within this district with respect to the facts and circumstances underlying this dispute, including without limitation by transacting in ADSs involving a depositary bank in this District, executing trades on NASDAQ facilities located within this District, and attending meetings in this District concerning Nano themselves and through their agents.  In addition, the Deposit Agreement that governs Defendants' holdings of Nano's ADS is governed by New York law.

34.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as Plaintiffs' claims for violation of the Exchange Act.

35.     Upon information and belief, in connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including interstate telephone communications, interstate electronic communications, and the facilities of a national securities exchange.

36.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b).

## FACTS

### I.     NANO'S TECHNOLOGICAL INNOVATIONS AND SUCCESS

37.     Founded in 2012, Nano develops and provides intelligent machines that are changing the way the world manufactures.  Its pioneering solutions are transforming design and production to match increased efficiency demands.  It specializes in reinventing analog and manual processes into fast, integrated, digital systems and has been an extraordinary technological innovator, especially in the 3D printing space.

38.     Nano is based in Israel.  Nano began publicly trading its shares in 2014, and was traded on the Tel Aviv Stock Exchange until 2020.

39.     Nano quickly saw early success and grew rapidly, creating an international market both for its products and international interest in investing in the company.

40.     In March 2016, Nano began trading its ADSs on NASDAQ.  The Bank of New York Mellon serves as the depository for Nano's ADSs.

41.     Customers and investors saw Nano's tremendous promise to change the shape of 3D printing industry.  Between 2020 and 2022, Nano's annual revenues grew by over 1,180%.

42.     In 2020 and 2021 alone, Nano raised more than $1.5 billion in funding.

43.     Nano put those funds to good use:  over 18 months between 2021 and January 2023, Nano strategically acquired six companies with key synergies for its technologies and

successfully merged them into its operations. These successful acquisitions contributed to a tenfold increase in annual revenues from $4 million to $43.6 million from December 2020 to December 2022.

44.     With over 500 employees located in Israel, the United States, Switzerland, the United Kingdom, the Netherlands, Germany, and Australia, Nano currently serves more than 2,000 customers spanning a variety of markets, including aerospace and defense, advanced automotive, high-tech industrial, specialty medical technology, research and development, and academia. Nano's customers include multiple Western armed forces and secret services, world renowned defense contractors from the United States and Europe, research institutes and space agencies, dozens of universities, and hundreds of industrial customers.

45.     Due to its enormous success in the market and investors' high interest in the Company, Nano has raised approximately $1.5 billion in funding, performed multiple successful acquisitions in Europe and Israel, and is in the process of negotiating more. Over $1 billion in cash and liquid assets remains available to fund its ongoing development, including research and development of its industry-changing technologies and strategic acquisitions.

46.     To further its growth and maximize value for its shareholders, Nano anticipates additional acquisitions of quality companies in the coming year.

## II.     MURCHINSON AND ANSON'S HISTORY OF DESTROYING VALUE FOR SHORT-TERM TRADING ADVANTAGE

### A.     Murchinson's Unlawful Schemes

47.     Murchinson and its founder, Marc Bistricer, have a long history of engaging in market manipulation for short-term trading advantage.

48.     For example, on August 17, 2021, the Securities and Exchange Commission settled charges against Murchinson and Bistricer in connection with violations of Regulation

SHO, ultimately resulting in Murchinson and Bistricer's disgorgement of the $7 million in profits they obtained as a result of their misconduct, as well as more than $1 million in pre-judgment interest and other penalties.  Regulation SHO protects markets from uncovered short sales and other problematic trading practices.  More specifically, the SEC determined that Murchinson and Bistricer provided false information on *hundreds* of sale orders of a hedge fund client to its brokers, which led those sales to be listed as "long" when they were actually "short" positions.

49.     In October 2021, Murchinson and Bistricer were named as defendants in a separate class action, *Herbert Silverberg v. DryShips Inc., et al*., alleging that they had engaged in a fraudulent scheme in concert with additional investment funds.  In that scheme, Murchinson, Bistricer, and others assisted DryShips, an offshore cargo company, to obtain hundreds of millions of dollars in capital that they then conspired to divert to insiders, while also manipulating the stock price to enable Murchinson and its co-conspirators to obtain a trading windfall.  Murchinson and the other defendants made numerous materially false and misleading statements to further this scheme, including false statements that various stock splits were in the "best interest" of the DryShips shareholders (they were not) and that DryShips intended to use the proceeds from the sales of securities to Kalani Investments Limited (a fund owned and controlled by Murchinson) "for general corporate purposes and/or to repay indebtedness" (they did not). In reality, the reverse stock splits were designed to enrich Murchinson at the expense of the shareholders, and the proceeds of the stock splits were then transferred to other defendant co-conspirators. The case is ongoing in the Eastern District of New York.

50.     In November 2022, the Ontario Securities Commission ("OSC") also launched proceedings against Murchinson's founder and CEO, Marc Bistricer, among other defendants, as a result of what OSC describes as an "illegal and abusive short selling scheme."  Notably, the

OSC found that Bistricer executed a four-part illegal short selling scheme through which Bistricer profited by more than $1.27 million.

**B.    Anson's Unlawful Schemes**

51.    Anson also has a long history of engaging in unlawful schemes that have resulted in civil and regulatory action.

52.    For example, in November 2015, Nobilis, a Canadian corporation that owns and manages ambulatory surgery centers, surgical hospitals, and medical marketing services brought an action in the Ontario Superior Court of Justice against Anson and other funds for their "unlawful short attack scheme" that involved broadcasting false and defamatory information about Nobilis in order to drive down the price of its public shares, and then using the decline in Nobilis's share price (which Anson and its co-conspirators caused) to increase their profits from short sales. Anson and its co-conspirator's false statements included publicizing allegations that Nobilis's auditors resigned amid controversy, that Nobilis's chief financial officers had been shuffled to hide impropriety, that insiders had sold all of their Nobilis common stock, and that the Nobilis was hiding poor performance behind acquisitions. Following publication of an article containing this allegedly false information, Nobilis's stock price fell by nearly 60%—an extraordinary decline that Nobilis alleges Anson immediately capitalized on to achieve large profits.

53.    In 2017, the Catalyst Capital Group Inc. ("Catalyst") and Callidus Capital Corporation ("Callidus"), a Canadian investment firm and a Canadian asset-based lender, respectively, brought an action against Anson in the Ontario Superior Court of Justice seeking to hold it accountable for its illegal securities transactions, including its short sales conspiracies. Anson's scheme with respect to Catalyst and Callidus followed a similar pattern: Anson spread false and defamatory information about Callidus and Catalyst,  which was ultimately published

in the *Wall Street Journal* and *Dow Jones Newswire*, causing a chaotic sell-off that enabled Anson and its co-conspirators to purchase reduced-price shares to cover their naked short positions. Anson ultimately made a substantial profit in connection with this scheme.

54.    In January 2022, Todd Augenbaum, a shareholder of Genius Brands International, Inc. ("Genius Brands"), filed an action in this district alleging that Anson violated federal securities laws in connection with improper short sales.  More specifically, Anson, acting as lead investor for and in coordination with other funds, engaged in illegal short-swing trades of Genius Brands.  In a familiar pattern, Anson and its co-conspirators acquired more than 10% of Genius Brands' shares and then engaged in a media campaign to manipulate Genius Brands' stock price for trading advantage and unlawful profits alleged to exceed $100 million.

55.    In May 2022, Sentia Wellness, Inc ("Sentia"), an Oregon cannabis company, asserted claims against Anson in Oregon state court alleging that Anson and other creditors to Sentia breached their fiduciary duty to Sentia's shareholders through a scheme to enrich themselves at the expense of the company. The claims contend that, after taking control of the company through board member appointments, Anson and its co-conspirators broke up the company and liquidated the assets for just $2 million in cash, enriching themselves instead of improving Sentia's long term revenue and operations.

56.    Indeed, in 2021, the Department of Justice also launched an investigation of Anson.  While the information concerning the investigation remains confidential and limited information has been disclosed, Anson was subpoenaed in March 2022 and public reports indicate that the inquiry is related to its short-selling practices.[1]

---

[1] https://www.bloomberg.com/news/articles/2022-03-25/hedge-fund-with-45-returns-drawn-into-doj-probe-of-short-sales#xj4y7vzkg

C.        **The Defendants' Connections and Prior Coordination**

57.      On information and belief, Anson, Murchinson, and Boothbay have coordinated with each other on prior occasions for trading advantage.

58.      Murchinson and Boothbay have a close working relationship.  Murchinson's November 18, 2022 Form ADV reveals, for example, that Boothbay is an advisor to two of Murchinson's prior private funds, Fund #8 and Fund #9.

59.      Murchinson and Boothbay have repeatedly engaged in coordinated trading activity.  For example, on February 17, 2022, Murchinson disclosed that it held a 3.22% interest (395,900 shares) in Benessere Capital Acquisition Corp. ("Benessere").[2] In its June 30, 2022, Form 13F, Boothbay reported that it *also* held 395,900 shares of the same company.[3]

60.      Likewise, in the fourth quarter of 2022, Boothbay and Murchinson both made similarly sized purchases of Immix Biopharma, Inc. shares.

61.      Further, in a March 17, 2023 letter, Murchinson *admitted* that it manages trading positions on behalf of Boothbay Absolute Return Strategies, LP and Boothbay Diversified Alpha Master Fund, LP—funds that also invest in Nano.

62.      Anson and Boothbay have also coordinated their trading positions in other companies.  For example, on December 31, 2021, Boothbay and Anson both purchased shares of Model Performance Acquisition Corp. ("Model Performance"), a special purpose acquisition company based in the British Virgin Islands. Anson purchased 456,461 shares, for a total of 8.2%.  Boothbay purchased 268,000 shares, which—with its prior ownership of 404,500

---

[2] https://www.sec.gov/Archives/edgar/data/1828735/000149315222005479/formsc13ga.htm
[3] http://edgar.secdatabase.com/1512/149315222022726/filing-main.htm

shares—brought its stake in the company to over 10%.  Exactly one year later, on December 31, 2022, Boothbay and Anson both sold 100% of their ownership in Model Performance.

63.     This confluence of trading patterns is not coincidental.  Rather, they represent coordinated trading activity between Defendants.

64.     Notably, Murchinson and Anson maintain offices within a one-minute walk to each other in Toronto.



(https://www.google.com/maps)

65.     Further, on November 14, 2022 Twitter User @BettingBruiser posted that "Murchinson [has been] described by many to be a biz partner of Anson Funds" and posited that Anson had coordinated its short-selling with Murchinson in connection with financings in the cannabis industry.

**III.    DEFENDANTS' MANIPULATIVE SCHEME AGAINST NANO**

66.     Defendants conspired to manipulate the price and market for Nano's ADSs in order to purchase shares at a discount and attempt to gain control of the Company and plunder its assets.

67.     Beginning in summer 2022, Defendants began secretly purchasing Nano ADSs. In the months that followed, they accumulated large sums of Nano ADSs—all without filing required SEC disclosures.  Instead, Defendants kept their coordination secret to manipulate the price for Nano ADSs, manufacturing an artificially low price for their outsized purchases.  By

March 2023, Defendants had amassed a more than 10% interest in the Company, which they

then used—along with a media campaign replete with false and misleading statements—to try to

take control of the Company and force it to distribute more than $1 billion in cash rather than use

those funds for their intended purpose, *i.e.*, to invest in Nano's long-term sustained growth.

A.      **Defendants' Secret Acquisitions of Nano ADSs Begin**

68.     Defendants began secretly acquiring shares of Nano ADSs in summer 2022,

increasing their holdings from approximately 300,000 shares of Nano ADSs on March 31, 2022

to more than 23,632,500 shares by year-end—acquiring a more than 9% interest in the Company.

69.     The table below sets forth Defendants' holdings as disclosed on their respective

Form 13Fs filed with the SEC during the relevant time period:[4]

| Entity | Number of ADSs | Percentage |
|---|---|---|
| **Defendants' holdings as of 3/31/22** | **300,000** | **0.12%** |
| Murchinson | 200,000 | 0.08% |
| Anson | 0 | 0.00% |
| Boothbay | 100,000 | 0.04% |
| **Defendants' holdings as of 6/30/22** | **9,141,801** | **3.54%** |
| Murchinson | 5,937,234 | 2.30% |
| Anson | 236,000 | 0.09% |
| Boothbay | 2,968,567 | 1.15% |
| **Defendants' holdings as of 9/30/22** | **19,668,536** | **7.62%** |
| Murchinson | 10,354,646 | 4.01% |
| Anson | 4,136,666 | 1.60% |
| Boothbay | 5,177,224 | 2.01% |
| **Defendants' holdings as of 12/31/22** | **23,632,517** | **9.15%** |
| Murchinson | 10,477,279 | 4.06% |
| Anson | 7,916,696 | 3.07% |
| Boothbay | 5,238,542 | 2.03% |

---

[4] Defendants' holdings of Nano ADSs on these dates are detailed in the Form 13Fs and/or Form
   13F-HRs filed by Murchinson, Anson, and Boothbay for the reporting periods ended March
   31, 2022, June 30, 2022, September 30, 2022, and December 31, 2022, which are incorporated
   by reference.

70.     On March 31, 2022, Defendants held approximately 300,000 shares of Nano ADSs.  By June 30, 2022, that number had ballooned—with Defendants holding approximately 9,141,800 Nano ADSs, representing a 3.54% stake in the Company.

71.     Defendants failed to disclose their cooperation, or when they first surpassed a 5% beneficial ownership interest in the Company, so that they could continue to purchase Nano ADSs at artificially low prices.

72.     By September 5, 2022, Murchinson had acquired more than 10,000,000 Nano ADSs.  That same day, Murchinson made a non-binding offer to purchase 100% of Nano's shares at a price of $4.00/share.

73.     Just two days later, on September 7, 2022, there was an enormous uptick in trades of Nano ADSs, accompanied by an intraday increase in share price of 12% and a closing price up 6% over the day before.

74.     Notably, on September 7, 2022, two parties executed large volume purchases of Nano's security within four minutes of each other.   The first purchase was for 932,200 shares at a price of $2.52/share; the second purchase was for 926,100 shares at a rate of $2.52.  These trades totaled 1.86 million shares, more than $4.5 million in value. Upon information and belief, the two parties executing those large trades were Anson and Boothbay.   Indeed, the Form 13Fs filed on September 30, 2022 reveal that Anson and Boothbay are the only entities whose holdings were sufficiently large that they could have plausibly made the trades.

75.     Murchinson's September 5, 2022 offer to acquire Nano was not public.  But Anson and Boothbay's September 7 purchases cannot have been mere coincidence:  rather, the trading pattern supports a strong conclusion that Anson and Boothbay purchased the shares based on their knowledge of non-public material information—namely, that Murchinson had offered to purchase Nano.

76.     Defendants deliberately made each of these purchases at discounted prices before news of Murchinson's offer became public.  Indeed, it is well established that stock prices tend to increase immediately following the announcement of an offer to purchase a company.[5] Defendants deliberately kept Murchinson's offer and their ongoing coordination secret, while they purchased large volumes of Nano ADSs at artificially low prices.

77.     On September 15, 2022, Nano declined Murchinson's offer to purchase the Company.

78.     Defendants' efforts to acquire additional shares, however, continued unabated. By September 30, 2022, Defendants held approximately 19,668,536 shares of Nano ADSs, representing 7.62% of the Company.

79.     Regulation 13D requires that an investor who owns more than 5% of a company file a Schedule 13D disclosing such beneficial ownership within 10 days of when they cross the 5% threshold. 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-1. When groups of investors are acting in coordination, they are required to file a Schedule 13D disclosure when *the group's total holdings* surpass 5% of the beneficial ownership. 15 U.S.C. § 78m(d)(3); 17 C.F.R. § 240.13d-3.

80.     Although Defendants held 7.62% of the Company by September 30, 2022, they failed to file a Schedule 13D disclosing their ownership within 10 days of September 30, 2022.

81.     Indeed, Murchinson has admitted that it manages Boothbay's trading positions, including specifically positions held by Boothbay Absolute Return Strategies, LP and Boothbay Diversified Alpha Master Fund, LP.  By September 30, 2022, Murchinson and Boothbay (even without Anson) together held more than 5% of Nano.  Yet, Murchinson and Boothbay *also* failed to file a Schedule 13D disclosing their ownership within 10 days of September 30, 2022.

---

[5] As just one example, shares of Twitter closed at $52/share on October 4, 2022, a 22% increase over the prior day's close, following news of Elon Musk's planned acquisition.

82.     Notwithstanding their failure to file a Schedule 13D disclosure, Murchinson, Anson, and Boothbay all continued to secretly make additional trades of Nano ADSs after they surpassed the 5% threshold.

83.     During this period, Defendants also used their significant market share, knowledge of confidential information, and coordinated media campaigns to engage in large volume trades for significant short-term profits.

84.     At a ThinkEquity Conference at the Mandarin Oriental Hotel in New York, New York on October 26, 2022, Marc Bistricer (Murchinson's founder and CEO) and Mark Lichtenstein (Murchinson's general counsel) forcibly interrupted Nano's CEO, Yoav Stern, when he was engaged in a private meeting with Nano's shareholders. Mr. Stern offered to meet with Bistricer at a later point, but Bistricer nonetheless continued his physical and verbal harassment of Mr. Stern, lobbying disparaging statements and threatening Nano and Mr. Stern.

85.     Bistricer's tirade at the private shareholder meeting disrupted Nano's relationship with its shareholders and created undue concerns regarding Nano's future prospects due to Murchinson's aggressive attempts to interfere with Nano's long-term growth and present operations.

86.     Murchinson repeated its offer to purchase Nano during this October 26, 2022, encounter, and Nano again declined the offer.

87.     On October 27, 2022, however, a party purchased *an additional* 3.4 million shares of Nano ADSs, at a value of more than $8 million. Upon information and belief, based on a review of trading records and SEC filings, this party was Anson.

88.     On November 3, 2022, Bloomberg published a report disclosing that Murchinson had made a non-binding offer to purchase the Company at $4.00 per share.  On information and

belief, Defendants leaked the offer to Bloomberg, without disclosing that it had already been twice-rejected.

89.     On November 4, 2022—the day following the Bloomberg article—Nano's ADSs closed at $2.76/share, up more than 14% from where they closed ($2.41) on November 2, before the article was published.

90.     Anson's October 27 purchase of Nano ADSs improperly attempted to capitalize on its knowledge of material, non-public information regarding Murchinson's offer by acquiring a large block of shares before news of the offer became public.

91.     By December 31, 2022, Defendants held approximately 23,632,517 shares of Nano ADSs, representing more than 9.15% of the Company.

92.     In other words, each of Murchinson, Boothbay, and Anson increased their holdings of Nano ADSs between September 30, 2022 and December 31, 2022, even though *none* of them had filed the required Schedule 13D disclosure.

93.     Defendants purchased this substantial volume of shares without any interest in actually investing in Nano.  On information and belief, by summer 2022, Defendants had learned that Nano held over $1 billion in cash and liquid assets.  Defendants accordingly engaged in each of the above purchases and coordinated their manipulative scheme for the purpose of taking over Nano's operations and dismantling its assets so those funds would be distributed to Defendants, rather than invested in Nano's long-term success.

**B.     Defendants' Ongoing Manipulation to Acquire Nano**

94.     Unable to purchase Nano outright through an offer, Defendants began a large-scale media campaign and proxy battle attacking Nano and its leadership.

95.     On January 22, 2023, Murchinson purported to demand a special meeting of

Nano's shareholders, seeking to amend Nano's articles of association and oust four of its board

members.

96.     Murchinson's January 22, 2023 demand revealed that Murchinson was acting in

coordination with Boothbay. Murchinson signed the demand on behalf of Boothbay Absolute

Return Strategies, LP and Boothbay Diversified Alpha Master Fund, LP pursuant to a power of

attorney.

97.     Notwithstanding their close coordination and power of attorney relationship,

Murchinson's Schedule 13D filed the next day (on January 23, 2023) did not disclose

Murchinson's relationship with Boothbay.

98.     Murchinson's demand was invalid as a matter of Israeli law, and Nano promptly

challenged it in court in Israel.  Unlike this case, which involves Defendants' violation of U.S.

securities laws and related misconduct, the case in Israel concerns the validity of Murchinson's

demand for a shareholder meeting under Israeli law. A preliminary hearing is set for June 18,

2023.

99.     Murchinson next began a series of invective-laden press releases aimed at

depressing Nano's share price and furthering Defendants' acquisition strategy. On February 2,

2023, Murchinson put out a press release falsely accusing Nano of a "culture of cronyism,"

"terrible corporate governance," and "us[ing]… acquisitions to mask the underperformance of

the company."  These assertions are entirely untrue.

100.     On February 8, 2023, Murchinson put out a press release falsely claiming that

Nano's CEO was likely to "rush into irresponsible acquisitions for the primary purpose of

diluting current shareholders and placing shares in friendly hands." This assertion was also

untrue, yet Murchinson repeated its false statements in similar press releases that followed on February 13 and February 22, 2023.

101.    On March 6, 2023, Murchinson released an investor presentation misleadingly titled "Saving Nano Dimension" in which it doubled-down on its false claims regarding Nano and its management. In this presentation, Murchinson falsely accused Nano of "drastically underperforming" during Mr. Stern's stint as Chairman, overseeing "terrible corporate governance," and creating "damaging capital allocation missteps." Murchinson claimed to seek to "establish accountability and transparency."  Murchinson failed to disclose its true objective, however:  seizing control of Nano and short-circuiting Nano's long-term growth by looting the company.

102.    Murchinson issued serial press releases repeating similar false claims on March 8, March 9, March 12, and March 20, 2023.

103.    Meanwhile, Anson was quick to support its co-conspirator Murchinson. On March 10, 2023, after Nano pushed back against Murchinson's illegal shareholder meeting demand, Anson issued a statement spreading false rumors about its purported "concern[] with the actions of Nano['s] management and Board." It accused Nano of engaging "in a highly destructive and distracting battle with an activist shareholder which is diverting management from prioritizing the Company's business prospects," a false characterization of a fight Murchinson picked in late 2022.

104.    On March 20, 2023, Defendants' campaign escalated further when Murchinson and Anson staged a fake "shareholder meeting" at which they purported to vote out members of Nano's board of directors and replace them with their own preferred nominees, then issued press releases falsely claiming that the board of Nano had been changed.

105.    The purported March 20 meeting was invalid as a matter of Israeli law and pursuant to the pertinent agreements.  ADS holders lack the authority to call shareholder meetings in the first place, under the terms of the pertinent agreements and Israeli law. In addition, Defendants failed to comply with Israeli legal requirements for calling shareholder meetings, including applicable notice requirements and required steps to verify share ownership. As a result of these severe legal challenges, the Bank of New York Mellon, the depository for Nano's ADSs, confirmed it would only take direction from an authorized offer of Nano to announce shareholder meetings.

106.    This ongoing smear campaign against Nano has harmed its current and prospective business relations and damaged its growth strategy.

107.    For example, for more than a year, Nano has been in discussions with EOS GmbH ("EOS"), another leading business in the additive manufacturing industry, concerning potential business combinations and partnerships that would unlock additional growth opportunities and shareholder value. Nano repeatedly spoke with Hans Langer, the founder and owner of EOS, among other key EOS agents and representatives.  As a result of Defendants' smear campaign, however, EOS terminated these discussions and informed Nano that they are not interested in pursuing any combinations with Defendants because of the mess with the Canadians (*i.e.,* Murchinson and Anson).

108.    Beginning in October 2022, Nano also engaged in serious business discussions Desktop Metal, a 3D printing company publicly traded on the New York Stock Exchange.  Nano and Desktop Metal held multiple in person meetings to discuss their plans, and had almost reached agreement on a deal through which Nano would acquire Desktop Metal in exchange for several hundred million dollars and a significant number of shares in Nano.  After Defendants' smear campaign erupted in early 2023, however, Desktop Metal's bank representatives informed

Nano that Desktop Metal was no longer interested in discussing any transaction with Nano that would require a shareholder vote (effectively terminating the possibility of any transaction whatsoever) because of the high risk that Defendants would interfere and attempt to prevent closing of the transaction.

109.    Defendant's interference also frustrated Nano's efforts to acquire the Israel-based 3D printing company Stratasys. On March 9, 2023, after months of engagement and discussions, Nano made a non-binding offer to purchase Stratasys for $18 per share. Stratasys is a strategic, complementary asset in the additive manufacturing market, and its acquisition would have made Nano the clear leader in the industry.

110.    Defendants were aware of the potential acquisition of Stratasys and actively sought to undermine it as part of their campaign to extract Nano's assets for themselves. Murchinson repeatedly criticized the plan in public statements and encouraged shareholders to oppose it.

111.    On March 22, 2023, amidst and partly as a result of Defendants' smear campaign, Stratasys's board voted to reject Nano's offer.

112.    On information and belief, Defendants' interference with Nano's potential business deals was knowing and intentional. In the course of their smear campaign, Defendants have repeatedly criticized Nano's growth plans involving potential merger and acquisition activity and sought to block such transactions.  Defendants' conduct was intentionally designed to prevent Nano from engaging in synergistic acquisitions that would promote Nano's long-term growth and success, because Defendants instead wanted to raid Nano's corporate assets and take for themselves funds that would otherwise be used for strategic acquisitions.

113.     As a result of Defendants' interference, Nano and its shareholders lost out on the economic opportunity and value that could have been achieved by these potential deals but for Defendants' misconduct.

114.     Meanwhile, Defendants have attempted to justify their conduct by blithely asserting that shareholders have lost confidence in Nano's leadership. But Defendants' own increasing acquisitions of Nano ADSs tell a different story—after all, it makes no sense to purchase *more* shares of a company in which you have lost confidence.  The reality is that Defendants never had any interest in Nano or any desire to see it succeed.  Rather, their efforts to acquire Nano ADSs have been part of a large scale scheme to raid corporate assets.  Defendants' repeated false and misleading statements about Nano and its leadership have only furthered that objective by driving down the price of Nano ADSs, enabling Defendants to execute on their scheme at lower prices.

C.     **The Truth Begins to Emerge About Defendants' Improper Coordination**

115.     Amidst their public campaign to smear Nano and its leadership, Defendants were behind the scenes rapidly accumulating Nano stock and profiting from their manipulation of the market through short-swing trading—all while flouting their SEC disclosure obligations as the largest shareholders of Nano.

116.     In early January 2023, Anson and Murchinson continued to make coordinated purchases of Nano ADSs:

a.   On January 9, 2023, Anson purchased 600,000 shares on the same day that Murchinson purchased 100,000 shares.

b.   On January 10, 2023, Anson purchased 500,000 shares on the same day that Murchinson purchased 250,000 shares.

    c.   On January 11, 2023, Anson purchased 500,000 shares on the same day that Murchinson purchased 391,640 share.

    d.   On January 12, 2023, Murchinson purchased a total of 1,314,035 shares.

117.    These purchases are just a few examples of Defendants' coordinated activity. All told, between January 1 and February 15, 2023, Murchinson purchased at least 3,196,660 shares, bringing its admitted beneficial ownership of Nano above 5%—although in reality Murchinson had crossed this threshold months earlier by virtue of its coordination with Anson and Boothbay. These purchases are set forth in Murchinson's Schedule 13Ds, which are attached as Exhibit 1.

118.    Meanwhile, between January 1 and March 9, 2023, Anson purchased at least 6,317,757 ADSs, bringing its admitted beneficial ownership above 5% (although, like Murchinson, Anson had passed this threshold months earlier). These purchases are set forth in Anson's Schedule 13Ds, which are attached as Exhibit 2.

119.    These purchases took the Murchinson-Anson-Boothbay group above 10% beneficial ownership of Nano's shares by January 11, 2023:  by December 31, 2022, Defendants held at least 23,632,517 shares representing at least 9.15% beneficial ownership of the company; the additional 2,191,194 shares that Anson and Murchinson purchased by January 11, 2023 therefore brought them above the 10% threshold.

120.    Defendants concealed this creeping accumulation of Nano's shares by failing to file Schedule 13Ds and, when they did file, omitting material information.

121.    Indeed, it was not until January 12, 2023—months after Defendants exceeded 5% and the day after they exceeded 10% ownership—that Murchinson filed a Schedule 13D with the SEC related to its acquisition of shares in Nano. Murchinson thereafter filed amended Schedule 13Ds on February 13, 2023 and March 6, 2023. Each of these Schedule 13Ds were signed by

Murchinson, Nomis, BPY, EOM, and Murchinson's officers and directors Marc Bistricer, James Keyes, and Chaja Carlebach.

122.    But across three separate Schedule 13D filings, Murchinson failed to disclose that it was coordinating with Anson and Boothbay as described above.  Murchinson also failed to disclose the date on which the combined group crossed the 5% and 10% thresholds.

123.    Anson also delayed filing its own Schedule 13D until months after Defendants crossed the 5% threshold. On March 10, 2023, Anson filed a Schedule 13D signed by Anson Funds Management LP, Anson Management GP LLC, Anson Advisors Inc., and Anson's officers and directors Bruce Winson, Moez Kassam, and Amin Nathoo.

124.    Like Murchinson, Anson's Schedule 13D failed to disclose that Anson was a member of a group with Murchinson and Boothbay as described above.

125.    As a result of the Anson's intentional misrepresentation and withholding of information regarding their coordination and purpose, Murchinson and Anson's Schedule 13Ds remain incomplete and misleading and violate Section 13(d) of the Exchange Act.

126.    Even in their incomplete and misleading form, the Schedule 13Ds finally shed light on what Defendants had intended all along. Murchinson's March 6, 2023 Schedule 13D attached its misleading "Saving Nano Dimensions" presentation and explained that Murchinson sought "immediate change […] to the Issuer's Board of Directors," as well as sweeping changes to Nano's "corporate governance" and "capital allocation"—all bywords for Defendants' plan to loot Nano's corporate assets and distribute them for short-term gain.

127.    Anson's March 10, 2023 Schedule 13D similarly disclosed that it intended to propose  "changes in [Nano's] operations, management, organizational documents, the composition of the Board, ownership, capital or corporate structure, dividend policy, and strategy and plans of the Issuer," which might include "changes to [Nano's] capital structure or ***the sale***

*of material assets or other extraordinary corporate transaction, including a sale of the Issuer*."
(emphasis added).  Defendants' Schedule 13Ds thus finally disclosed what Defendants had been
planning privately for months while evading SEC disclosure requirements.

128.    Meanwhile, Anson and Murchinson used their undisclosed accumulation of stock
to profit from short-swing trading of Nano shares.

129.    To prevent abuse by large shareholders and other insiders, Section 16(b) of the
Exchange Act,15 U.S.C. 78p(b), requires that any profits derived from short-swing trading be
disgorged to the issuer of stock. Short-swing trading is defined as the purchase and sale (or vice
versa) of a company's stock within a six-month period by persons deemed to be "insiders" under
the statute.

130.    An "insider" is defined in the statute as a beneficial owner of more than ten
percent of any class of the company's non-exempt, registered equity securities, or a director or
officer of the company issuing the stock. 15 U.S.C. § 78p(a), (b). For ten-percent holders and
other insiders, short-swing trading is a strict liability offense, and any profits are automatically
subject to disgorgement.

131.    For purposes of determining insider status as a ten-percent holder, the SEC's
regulations provide that beneficial ownership is determined under the same standard as Section
13(d). 17 C.F.R. § 240.16a–1(a)(1).  As a result, when groups of investors are acting in
coordination, Section 16(b) short-swing liability and disclosure obligations attach when *the
group's total holdings* surpass 10% of the beneficial ownership.

132.    Defendants crossed the 10% ownership threshold at least as early as January 11,
2023, making each of them "insiders" under this definition.

133.    Shortly after becoming statutory insiders, Defendants began aggressively buying Nano shares when the market temporarily dipped (as a result of their own defamatory smear campaign) and then selling the ADSs days later.

134.    For example, Anson's purchases through Anson Funds Management LP included the following low-priced transactions, as set forth in its Schedule 13D attached as Exhibit 2.

     a. On January 19, 2023, Anson purchased 511,002 ADSs at a price of $2.3201 per share.

     b. On January 20, 2023, Anson purchased 828,000 ADSs at a price of $2.50 per share.

     c. On January 23, 2023, Anson purchased 23,983 ADSs at a price of $2.4775 per share.

     d. On February 10, 2023, Anson purchased 132,249 ADSs at a price of $2.4743 per share.

135.    Shortly thereafter, Anson sold these ADSs at a substantial profit:

     a. On January 27, 2023, Anson sold 228,770 ADSs at a price of $2.8667 per share.

     b. On February 2, 2023, Anson sold 58,018 ADSs at a price of $2.89 per share.

     c. On February 3, 2023, Anson sold 79,438 ADSs at a price of $2.8829 per share.

     d. On February 15, 2023, Anson sold 403,044 ADSs at a price of $2.9123 per share.

     e. On February 16, 2023, Anson sold 185,574 ADSs at a price of $2.9906 per share.

     f. On March 6, 2023, Anson sold 27,473 ADSs at a price of $3.187 per share.

136.    Anson has realized more than $508,893 in profits by purchasing and selling Nano ADSs between January 19, 2023 and March 6, 2023 alone.

137.    During this time, Murchinson also profited from this short-swing trading of Nano ADSs. On January 19, 2023, Murchinson and its affiliates purchased 50,000 ADSs at a price of 2.3522 per share. On February 15, 2023, Murchinson and its affiliates sold 22,086 of these ADSs at a price of $2.968 per share.  In those transactions alone, Murchinson and its affiliates realized at least $13,884.13 in profit from purchasing and selling Nano ADSs. These trades are set forth in Murchinson's Schedule 13Ds attached as Exhibit 1.

138.    Like Defendant's creeping acquisition of more than 10% of Nano's shares, Defendants' trades profiting from short-term swings in Nano's stock value are another example of the abuses that the Exchange Act seeks to remedy.

139.    Defendants' fraudulent concealment of information regarding their creeping acquisition also had another purpose: evading safeguards put in place by Nano's Board of Directors to protect Nano's shareholders.

**D.    Defendants Breached Their Contract with Nano**

140.    In addition to violating federal law, Defendants' scheme to manipulate the market for Nano ADSs and secretly acquire a controlling interest at discounted prices breached Defendants' contract with Nano.

141.    All Nano ADSs, including those held by Defendants, were issued subject to a deposit agreement governing the relationship between Nano, the holders of the ADSs, and the depositary bank for the ADSs. The deposit agreement currently in force is the Amended and Restated Deposit Agreement dated April 15, 2019, which is attached as Exhibit 3 ("the Deposit Agreement").

142.    Defendants took ownership of their ADSs subject to the terms of the Deposit

Agreement, which are endorsed on each ADS. Defendants' assent to these terms was a key term

of the bargain through which Defendants were allowed to obtain interests in Nano.

143.    While Nano has performed its obligations under the Deposit Agreement,

Defendants have flouted their own obligations.

144.    Pursuant to the Deposit Agreement, Defendants are required to comply with

applicable disclosure and notice requirements to the same extent as if the holder was a registered

holder of Nano's ordinary shares:

> Each Holder and Owner agrees to comply with any applicable law,
> including in both the United States and Israel, with regard to the
> notification to the Company of the holding or proposed holding of
> certain interests in Shares and the obtaining of certain consents, to
> the same extent as if such Holder or Owner were a registered
> holder or beneficial owner of Shares. The Depositary is not
> required to take any action with respect to such compliance on
> behalf of any Holder or Owner, including the provision of the
> notification described below.

(Deposit Agreement § 3.4.)

145.    Defendants are also specifically obligated to comply with disclosure obligations

under U.S. law that are triggered upon reaching 5% ownership or higher—*i.e.*, disclosures

pursuant to the Section 13(d) of the Exchange Act:

> Each Holder and Owner agrees to comply with the provisions of
> applicable law, including in both the United States and Israel,
> which may require that persons who hold a direct or indirect
> interest in 5% or more of the voting securities of the Company
> (including persons who hold such an interest through the holding
> of American Depositary Shares) give written notice of their
> interest and any subsequent changes in their interest to the
> Company.

(Deposit Agreement § 3.4.)

146.    Defendants breached these terms of the Deposit Agreement by failing to comply

with their disclosure obligations under federal law as detailed above, including by:

a. Failing to file a Schedule 13D disclosure as required when Defendants'
combined beneficial ownership exceeded 5% ownership of Nano;

b. Filing false and misleading Schedule 13Ds that failed to disclose that
Murchinson, Anson, and Boothbay are working together as a coordinated
group;

c. Failing to file appropriate disclosures once Defendants' combined beneficial
ownership surpassed 10% of Nano's shares.

147. As a result of Defendants' breaches, Nano has suffered a decline in enterprise
value, lost business opportunities, and incurred significant costs and expenses in responding to
Defendants' breaches of the Deposit Agreement and violations of law.

148. Nano has also suffered irreparable harm from Defendants' breaches in that
Defendants have been permitted to hold and acquire shares to which they have no legal right by
virtue of their breach of the Deposit Agreement. Defendants have used these shares to mount a
takeover campaign that threatens to destroy Nano's business, end its existence as a going
concern, and deprive Nano's shareholders of value to be realized from their investment in
Nano's long-term success.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of Exchange Act Section 13(d), 15 U.S.C. § 78m(d) – Failure to File Schedule 13D**
**(Against All Defendants)**

149. Plaintiffs incorporate the foregoing paragraphs by reference as if fully set forth
herein.

150. Section 13(d) of the Exchange Act requires that any stockholder (or group of
stockholders) that acquires more than 5% of a company's registered stock must publicly report
their ownership interest to the company and the market. As explained by the SEC:

> If [a] company has registered a class of its equity securities under
> the Exchange Act, shareholders who acquire more than 5% of the
> outstanding shares of that class must file beneficial owner reports
> on Schedule 13D or 13G until their holdings drop below 5%.
> These filings contain background information about the
> shareholders who file them as well as their investment intentions,
> providing investors and the company with information about
> accumulations of securities that may potentially change or
> influence company management and policies.

(https://www.sec.gov/education/smallbusiness/goingpublic/officersanddirectors).

151.    Specifically, Section 13(d) and its implementing regulations require that any

person, or any group of persons, acting for the purpose of acquiring, holding, or voting a

corporation's securities must file a statement known as Schedule 13D with the SEC within 10

days after acquiring beneficial ownership of more than 5% of any class of the corporation's

voting securities. 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-1.

152.    The Schedule 13D disclosure must set forth the reporting person's background,

identity, residence, citizenship, and the nature and amount of their beneficial ownership.

153.    A Schedule 13D disclosure must also report the source and amount of funds used

to purchase the beneficially owned securities. If the purchasers' purpose is to obtain control of

the corporation, their Schedule 13D must set forth their plans or proposals for any major change

in the corporation's structure.

154.     In addition, a Schedule 13D must report the purchasers' agreements,

arrangements, or understandings concerning the corporation's securities.

155.    Under Section 13(d) and its implementing regulations, a group that acts together

to acquire more than 5% of a company's securities is required to disclose their combined

ownership on Schedule 13D: "When two or more persons agree to act together for the purpose of

acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby

shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of

the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons."  17 C.F.R. § 240.13d-5.

156.    When an investor fails to comply with Section 13(d), the issuer of the shares has standing to bring an action to compel compliance. As the issuer of the ADSs, Nano has standing to bring an action against Defendants.

157.    As detailed above, Murchinson, Anson, and Boothbay have acted together to acquire more than 5% of Nano's common stock through Nano ADSs, requiring them to report as a group on Schedule 13D.

158.    Defendants' group crossed the 5% ownership threshold before September 30, 2022, requiring Defendants to file a Schedule 13D and make the required disclosures of their group's agreements, financing, background, and other information set forth on Schedule 13D.

159.    Defendants failed to file a Schedule 13D disclosing their group.

160.    Based on the above violations, plaintiffs have been, are now, and will be irreparably injured because defendants' failure to file complete Schedule 13D's deprives Nano and its shareholders of information to which they are lawfully entitled and which is necessary to understand Defendants' purposes and plans concerning Nano.

161.    Nano has no adequate remedy at law.

162.    Nano is entitled to an Order directing Defendants to file Schedule 13Ds that comply in all respects with the pertinent statutory and regulatory requirements.  Nano is further entitled to an Order enjoining Defendants from acquiring further shares or making any effort to vote or change or affect control of Nano pending the completion of required Schedule 13D filings.

### SECOND CAUSE OF ACTION
**Violation of Exchange Act Section 13(d), 15 U.S.C. § 78m(d) – Filing of False and
Misleading Schedule 13Ds
(Against Murchinson and Anson)**

163.    Plaintiffs incorporate the foregoing paragraphs by reference as if fully set forth
herein.

164.    Section 13(d) of the Exchange Act precludes the filing of false and/or misleading
disclosure schedules.  *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) ("A duty to
file under § 13(d) creates the duty to file truthfully and completely").

165.    When an investor fails to comply with Section 13(d), the issuer of the shares has
standing to bring an action to compel compliance. As the issuer of the ADSs, Nano has standing
to bring an action against Defendants.

166.    On January 12, 2023, Murchinson Filed a Schedule 13D with the SEC related to
its acquisition of shares in Nano. It filed amended Schedule 13Ds on February 13, 2023 and
March 6, 2023. Each of these Schedule 13Ds were signed by Murchinson, Nomis, BPY, EOM,
and Murchinson's officers and directors Marc Bistricer, James Keyes, and Chaja Carlebach.

167.    Murchinson's Schedule 13D filings failed to disclose that Murchinson was a
member of a group with Anson and Boothbay as alleged above.

168.    Each of Murchinson's Schedule 13D filings also failed to disclose material
information regarding its agreements, arrangements, and understandings with respect to Nano'
securities. Among other omissions, the filings failed to disclose that Murchinson was acting
together with Anson and Boothbay to acquire shares in Nano and that the three parties had an
agreement to manipulate Nano's stock price for short-term profits and to facilitate their
attempted takeover.

169.    As a result of the Murchinson's intentional misrepresentation and concealment of this information, Murchinson's Schedule 13Ds were misleading and violated Section 13(d).

170.    Anson similarly filed a false and misleading Schedule 13D. On March 10, 2023, Anson filed a Schedule 13D signed by Anson Funds Management LP, Anson Management GP LLC, Anson Advisors Inc., and Anson's officers and directors Bruce Winson, Moez Kassam, and Amin Nathoo.

171.    The Anson's Schedule 13D failed to disclose that Anson was a member of a group with Murchinson and Boothbay as alleged above.

172.    Anson's Schedule 13D filings also failed to disclose material information regarding its agreements, arrangements, and understandings with respect to Nano' securities. Among other omissions, the filings failed to disclose that Anson was acting together with Murchinson and Boothbay to acquire shares in Nano and that the three parties had an agreement to manipulate Nano's stock price for short-term profits and to facilitate their attempted takeover.

173.    As a result of the Anson's intentional misrepresentation and concealment of this information, Anson's Schedule 13D was misleading and violated Section 13(d).

174.    Based on the above violations, plaintiffs have been, are now, and will be irreparably injured because Murchinson and Anson's filing of false and misleading Schedule 13Ds deprives Nano and its shareholders of information to which they are lawfully entitled and which is necessary to understand Defendants' purposes and plans concerning Nano.

175.    Nano has no adequate remedy at law.

176.    Nano is entitled to an Order directing Defendants to file Schedule 13Ds that comply in all respects with the pertinent statutory and regulatory requirements.  Nano is further entitled to an Order enjoining Defendants from acquiring further shares or making any effort to

vote or change or affect control of Nano pending the completion of required Schedule 13D filings.

### THIRD CAUSE OF ACTION
### Breach of Contract
### (Against All Defendants)

177.    Plaintiff Nano incorporates the foregoing paragraphs by reference as if fully set forth herein.

178.    Nano and Defendants are parties to the Amended and Restated Deposit Agreement dated April 15, 2019. The Deposit Agreement is annexed to and incorporated into each ADS, and Defendants took ownership of their Nano ADSs subject to the term so the Deposit Agreement.

179.    Nano has materially performed its obligations under the Deposit Agreement.

180.    Defendants have breached their obligations under the Deposit Agreement, including by failing to comply with federal law governing disclosure and reporting of their ownership interest in Nano. Defendants' breaches include:

  a.    Failing to file a report on Schedule 13D as required when the Murchinson-Anson-Boothbay group exceeded 5% ownership of Nano;

  b.    Filing false and misleading Schedule 13Ds for Murchinson and Anson that failed to disclose the Murchinson-Anson-Boothbay group;

  c.    Failing to file appropriate disclosures once Defendants' combined beneficial ownership surpassed 10% of Nano's shares; and

  d.    Attempting to stage a fictitious shareholder meeting that was not permitted by the terms of the Deposit Agreement or applicable law.

181.    Nano has been damaged as a result of Defendants' breaches as alleged herein and is entitled to damages.

182.     Nano has also suffered and will continue to suffer irreparable harm from Defendants' breaches such that money damages alone will be insufficient to compensate Nano or restore the status quo. Accordingly, Nano is also entitled to equitable remedies including a rescission of Defendants' ADSs and injunctive relief.

183.     Defendants' actions were gross, wanton, willful, and one in furtherance of a conspiracy to maliciously harm and damage Nano and defraud the investing public, for which punitive damages should be awarded.

### FOURTH CAUSE OF ACTION
### Tortious Interference with Business Relations
### (Against All Defendants)

184.     Nano incorporates the foregoing paragraphs by reference as if fully set forth herein.

185.     Nano enjoyed existing and prospective business relationships in that, Nano was in active discussions with EOS, Desktop Metal, and Stratsys concerning strategic deals, as described above.

186.     Defendants engaged in the wrongful conduct detailed above, including their manipulation of the market for Nano's stock for short-term gain and in order to facilitate their attempted takeover of Nano and their smear campaign against Nano.

187.     As a result of Defendants' smear campaign, the potential business partners terminated discussions with Nano and cited Murchinson's claims against Nano as the reason for doing so.

188.     Defendants' interference with Nano's potential business transactions was knowing and intentional.

189.    As a result of Defendants' wrongful conduct, Nano was injured in that Nano and its shareholders lost out on the economic opportunity and value that could have been achieved by the potential transactions but for Defendants' misconduct.

190.    Defendants' actions were gross, wanton, willful, and one in furtherance of a conspiracy to maliciously harm and damage Nano and defraud the investing public, for which punitive damages should be awarded.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Against All Defendants)**

191.    Nano incorporates the foregoing paragraphs by reference as if fully set forth herein.

192.    As alleged in the foregoing paragraphs, Defendants have engaged in a pattern of wrongful conduct in which they have manipulated the market for Nano's stock for short-term gain and in order to facilitate their attempted takeover of Nano.

193.    Through their conduct, Defendants have been unjustly enriched at Nano's expense by (1) artificially suppressing the stock price for Nano, which allowed them to buy more shares at artificially depressed prices (2) obtaining proceeds from those ill-gotten shares, (3) selectively releasing partial information regarding their offer to purchase Nano in order to cause the value of their shares to increase, and (4) reaping short-term profits by buying and selling Nano shares at manipulated prices through short-swing trading.

194.    It is against equity and good conscience to permit Defendants to retain the proceeds of their wrongful conduct. Nano accordingly seeks an order compelling Defendants to disgorge these proceeds to Nano.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment against Defendant and in favor of Plaintiff, and issue the following relief:

(a)     Order Defendants to file an appropriate Schedule 13D for their entire group, as set forth herein;

(b)     Order Defendants Murchinson and Anson to correct their false and misleading Schedule 13Ds;

(c)     Enjoin Defendants from acquiring further shares of Nano, voting their existing shares, making any tender offer or proxy solicitation, or making any effort to change or affect control of Nano pending completion of Defendants Schedule 13D filings and a reasonable "cooling off" period following such filings;

(d)     Enjoin Defendants from disposing of their existing shares except by unsolicited sales on the open market that are not prearranged;

(e)     Order disgorgement of Defendant's short-swing profits on sales of Nano ADSs to Nano to prevent unjust enrichment;

(f)     Order rescission of Defendants' ADSs;

(g)     Award punitive and exemplary damages as may be allowable;

(h)     Award damages and equitable monetary relief according to proof;

(i)     Award Nano its attorneys' fees and costs as provided by law;

(j)     Grant preliminary and permanent injunctive relief to prevent further irreparable harm to Nano; and

(k)     Award all such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial of all claims and causes of action triable before a jury.

Dated: March 27, 2023

Respectfully Submitted,

*/s/ Jonathan Kortmansky*
J. Noah Hagey, Esq.
Jonathan Kortmansky, Esq.
Melissa Ginsberg, Esq.
**BRAUNHAGEY & BORDEN LLP**
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403
Facsimile: (415) 276-1808
hagey@braunhagey.com
kortmansky@braunhagey.com
ginsberg@braunhagey.com

*Attorneys for Plaintiff Nano Dimension Ltd.*