UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NANO DIMENSION LTD.,

                              Plaintiff,

               -against-

MURCHINSON LTD., et al.,

                              Defendants.

1:23-cv-02566 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

On March 27, 2023, Plaintiff Nano Dimension ("Nano" or "Plaintiff") commenced this action against: Murchinson Ltd., EOM Management LTD, Nomis Bay Ltd., and BPY Limited (together, "Murchinson"); Anson Advisors Inc., Anson Funds Management LP, and Anson Management GP LLC (together, "Anson"); and Boothbay Fund Management, LLC, Boothbay Absolute Return Strategies LP, and Boothbay Diversified Alpha Master Fund, LP (together, "Boothbay," and collectively with Murchinson and Anson, "Defendants"). *See* ECF No. 1 ("Compl.").[1]  Plaintiff filed an Amended Complaint on June 22, 2023.  *See* Am. Compl.  The Amended Complaint alleges violations of the securities laws, breach of contract, tortious interference with business relations, and unjust enrichment.  *See id.*  Before the Court are

---

[1] Filings relevant to this Opinion and Order include: the Amended Complaint, ECF No. 120 ("Am. Compl."); Murchinson and Anson's first motion to dismiss, ECF No. 88 ("M&A MTD1"), opening brief, ECF No. 91 ("M&A Br.1"), and letter in reply, ECF No. 115 ("M&A Reply1"); Nano's opposition to the M&A MTD1, ECF No. 102 ("M&A Opp.1"); Boothbay's first motion to dismiss, ECF No. 83 ("B. MTD1"), and opening brief, ECF No. 84 ("B. Br.1"); Nano's opposition to the B. MTD1, ECF No. 103 ("B. Opp.1"); Murchinson and Anson's supplemental motion to dismiss, ECF No. 131 ("M&A MTD2"), opening brief, ECF No. 135 ("M&A Br.2"), and reply, ECF No. 140 ("M&A Reply2"); Nano's opposition to the M&A MTD2, ECF No. 137 ("M&A Opp.2"); Boothbay's supplemental motion to dismiss, ECF No. 129 ("B. MTD2"), opening brief, ECF No. 130 ("B. Br.2"), and reply, ECF No. 139 ("B. Reply"); and Nano's opposition to the B. MTD2, ECF No. 136 ("B. Opp.2").

Defendants' motions to dismiss and Plaintiff's motion for a preliminary injunction.  For the following reasons, the Amended Complaint is DISMISSED, and Plaintiff's motion for a preliminary injunction is DENIED as moot.

## BACKGROUND[2]

### I.   The Parties

Plaintiff Nano is an Israeli manufacturing company with operations in Israel, the United States, Switzerland, the United Kingdom, the Netherlands, and Australia.  Am. Compl. ¶ 8. Nano's products include "additively manufactured electronics ('AME'), printed electronics, micro additive manufacturing, artificial intelligence deep learning, surface-mount technology, and inkjet solutions."  *Id*.  Since March 2016, Nano has been trading on NASDAQ through American Depositary Shares ("ADSs").  *Id*. ¶¶ 3, 8, 51.  The company currently maintains over one billion dollars in cash and liquidated assets.  *Id*. ¶ 49.

Defendant Murchinson Ltd. is a hedge fund based in Toronto, Canada.  *Id*. ¶ 9. Murchinson Ltd. "owns and controls" Nano ADSs through several hedge funds based in Bermuda, including Defendants EOM Management LTD ("EOM"), Nomis Bay Ltd. ("Nomis"), and BBY Limited ("BPY").  *Id*. ¶¶ 11-14.  Murchinson also "controls" certain Boothbay holdings, including in Nano.  *Id*. ¶¶ 23, 180-181.

Defendant Boothbay Fund Management, LLC ("Boothbay Fund") is an investment firm with an office in New York that holds Nano ADSs through two hedge funds in New York:

---

[2] Unless otherwise noted, the facts stated herein are taken from the Amended Complaint and accepted as true for the purposes of resolving Defendants' motions to dismiss, as well as from documents attached to or otherwise incorporated into the Amended Complaint.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *Rubenstein v. Int'l Value Advisers, LLC*, 363 F. Supp. 3d 379, 383 & n.2 (S.D.N.Y. 2019), *aff'd*, 959 F.3d 541 (2d Cir. 2020) (considering Schedule 13Ds referenced in the complaint).

Defendants Boothbay Absolute Return Strategies LP ("Boothbay Absolute") and Boothbay Diversified Alpha Master Fund, LP ("Boothbay Diversified"). *Id.* ¶¶ 16-21. Boothbay entered an investment advisory relationship with Murchinson, under which Murchinson manages Boothbay's holdings while Boothbay has the right to "regain" control within five days for "good reason." *Id.* ¶¶ 26, 70, 180-181. As such, Murchinson "controls Boothbay's investment in Nano and acts as Boothbay's legal agent" for the investment. *Id.* ¶¶ 23-24, 70. Their relationship also "extends beyond" Nano to management of private funds. *Id.* ¶¶ 24, 67.

Defendant Anson Advisors Inc. ("Anson Advisors") is a private asset management firm and an advisor to certain investment funds (the "Anson Funds") with an office in Toronto, Canada. *Id.* ¶ 27. Anson Advisors owns Nano ADSs through multiple entities under its control, including Defendants Anson Funds Management LP ("Anson Management") and Anson Management GP LLC ("Anson GP"). *Id.* ¶¶ 28-30. Anson Management is an investment fund manager of the Anson Funds based in Texas. *Id.* ¶ 29. Anson GP is the general partner of Anson Management and is also based in Texas. *Id.* ¶ 30.

## II.      The Conduct

The Amended Complaint alleges that Defendants together accumulated ADSs in Nano and called a shareholder meeting in violation of the securities laws and their deposit agreements. Beginning in 2022 and continuing through March 2023, Defendants increased their share of Nano ADSs, as depicted by Plaintiff in the following table:

| Entity | Number of ADSs | Percentage |
|---|---|---|
| **Defendants' holdings as of 3/31/22** | **300,000** | **0.12%** |
| Murchinson | 200,000 | 0.08% |
| Anson | 0 | 0.00% |
| Boothbay | 100,000 | 0.04% |
| **Defendants' holdings as of 6/30/22** | **9,141,801** | **3.54%** |
| Murchinson | 5,937,234 | 2.30% |
| Anson | 236,000 | 0.09% |

| | | |
|---|---|---|
| Boothbay | 2,968,567 | 1.15% |
| **Defendants' holdings as of 9/30/22** | **19,668,536** | **7.62%** |
| Murchinson | 10,354,646 | 4.01% |
| Anson | 4,136,666 | 1.60% |
| Boothbay | 5,177,224 | 2.01% |
| **Defendants' holdings as of 12/31/22** | **23,632,517** | **9.15%** |
| Murchinson | 10,477,279 | 4.06% |
| Anson | 7,916,696 | 3.07% |
| Boothbay | 5,238,542 | 2.03% |
| **Defendants' holdings as of 3/31/23** | **35,612,579** | **13.80%** |
| Murchinson | 14,508,539 | 5.62% |
| Anson | 13,981,102 | 5.42% |
| Boothbay | 7,122,938 | 2.76% |

*Id.* ¶ 78 ("Table 1").  The Amended Complaint does not allege the precise dates that the ADSs were traded within these three-month reporting periods.  *See id.* ¶ 78.[3]

The Amended Complaint alleges that, in September and October 2022, Murchinson offered to purchase Nano outright, and Anson made large purchases of Nano ADSs based on those non-public offers.  Specifically, on September 5, 2022, Murchinson made a non-binding offer to purchase Nano, which was rejected on September 15, 2022.  *Id.* ¶¶ 82, 87.  Upon information and belief, Plaintiff alleges that Anson purchased $4.5 million of Nano ADSs based on non-public information of that offer on September 7, 2022.  *Id.* ¶¶ 84-85.[4]  On October 26, 2022, Murchinson repeated its non-binding offer to Nano, which Nano again declined.  *Id.* ¶ 95.

---

[3] As the table indicates, the number of ADSs Plaintiff attributes to Murchinson are exactly double the ADSs Plaintiff attributes to Boothbay for each reporting period.  In its motion to dismiss Plaintiff's initial Complaint, Boothbay argued that this is the result of Plaintiff "double-counting" ADSs held by Boothbay but otherwise controlled, managed, and reported by Murchinson.  *See* B. Br.1 at 6 & n.4; *see also* B. Opp.1 at 9.  Plaintiff thereafter filed the Amended Complaint, which includes the original table copied above, *see* Am. Compl. ¶ 78, and a new second table that seeks to correct the "double-counting" by relabeling the Murchinson rows as "Murchinson and Boothbay" and omitting the standalone Boothbay rows entirely, *see id.* ¶ 79.  Because the Court finds that the Amended Complaint fails under either approach, it need not resolve whether Plaintiff's allegations "double count" Boothbay's holdings in Nano.

[4] Plaintiff initially alleged that Boothbay also made such a purchase based on this information, but dropped this allegation in the Amended Complaint.  *See generally* Am. Compl.

Upon information and belief, Plaintiff alleges that Anson purchased another $8 million of Nano ADSs two days later based on the non-public information of Murchinson's offer.  *Id.* ¶ 96.

The Amended Complaint alleges that, beginning in January 2023, Murchinson and then Anson made a series of statements and disclosures regarding Nano.  On Sunday, January 22, 2023, Murchinson sent a letter to Nano's Board of Directors demanding that it call a special general meeting of shareholders (the "Special Meeting").  *See* Am. Compl. ¶ 104; ECF No. 1-1 at 2-20 (the "Murchinson January 13D").  Murchinson sought the Special Meeting to allow a shareholder vote on proposals to change Nano's articles of association and "oust four" of Nano's Board members.  Am. Compl. ¶ 104.  Murchinson signed the demand on its own behalf and for Boothbay pursuant to a power of attorney.  *Id*. ¶ 105.  The next business day, January 23, 2023, Murchinson filed a public disclosure, known as a Schedule 13D, with the Securities and Exchange Commission ("SEC").  *See id*. ¶¶ 106, 132; Murchinson January 13D.  In that disclosure, Murchinson publicly revealed that it had acquired 5.1% of Nano ADSs and had sent the demand for the Special Meeting to Nano.  *See generally* Murchinson January 13D.

Following its January Schedule 13D, Murchinson issued several press releases accusing Nano of mismanagement.  On February 2, 2023, Murchinson issued a press release criticizing Nano of "terrible corporate governance" and "us[ing] . . . acquisitions to mask the underperformance of the company," among other things.  *Id*. ¶ 108.  Murchinson made similar public statements on February 8, 13, and 22, 2023.  *See id.* ¶ 109.  Plaintiff alleges that Murchinson's public statements were "false," and that Nano publicly "pushed back" against them.  *Id*. ¶¶ 108-109, 112.

Murchinson amended its Schedule 13D in February and March 2023.  On February 13, 2023, Murchinson filed its first amendment, disclosing that Nano had rejected the demand for the

Special Meeting.  *See id.* ¶¶ 135, 214; ECF No. 1-1 at 21-36 (the "Murchinson February 13D").  Because Nano refused to call the Special Meeting, Murchinson disclosed that it would be "exercising [its] rights" under Israeli law to call the Special Meeting itself on March 20, 2023.  Murchinson February 13D at 30.  On March 6, 2023, Murchinson filed a second amendment to its Schedule 13D.  *See* Am. Compl. ¶ 135; ECF No. 1-1 at 37-51 (the "Murchinson March 13D").  This amendment attached an investor presentation critical of Nano's corporate governance, and disclosed that Murchinson would propose "changes in [Nano's] operations, management, organizational documents, the composition of the Board, ownership, capital or corporate structure, dividend policy, and strategy and plans of [Nano]," potentially including "changes to [Nano's] capital structure or the sale of material assets or other extraordinary corporate transaction, including a sale of [Nano]."  Am. Compl. ¶ 141.  Plaintiff alleges that Murchinson's second amendment "finally began to disclose some portion of what Defendants had been planning privately for months," and that the amendment and other public statements by Murchinson contained "false" accusations about Nano.  *Id.* ¶¶ 110-111, 141.

On March 9, 2023, Anson filed a Schedule 13D disclosing that it had acquired 5.1% of Nano ADSs.  *See id.* ¶ 137; ECF No. 1-2 (the "Anson March 13D").  Anson's Schedule 13D expressed "disappointment in [Nano]'s apparent refusal to constructively engage with its shareholders."  Anson March 13D at 11.  Anson followed the disclosure with a public statement that it was "concern[ed] with the actions of Nano's management and Board."  Am. Compl. ¶ 112 (internal alterations adopted).  Plaintiff alleges that Anson's statements about Nano were "false." *Id.*  Plaintiff also alleges that Murchinson and Anson profited from short-swing trades in Nano ADSs as they criticized the company, including Murchinson earning $13,884.13 and Anson earning $508,893.00 during this period.  *Id.* ¶¶ 148-152.

On March 20, 2023, Murchinson and Anson "staged" the Special Meeting.  *Id.* ¶ 113.
The Amended Complaint does not specifically allege the outcome of the meeting, instead stating
generally that ADS-holders "vote[d] out members of Nano's board of directors and replace[d]
them with their own preferred nominees . . . ."  *Id.*  According to an amendment to Murchinson's
Schedule 13D, ADS-holders replaced two members of the board and removed two others.  ECF
No. 89-1 (the "Murchinson May 13D") at 10.  Plaintiff alleges that the Special Meeting was
improper because Murchinson and Anson lacked the authority to call it under their deposit
agreements and Israeli law, and Defendants did not make full disclosures under the securities
laws.  Am. Compl. ¶ 114.

The Amended Complaint alleges that Nano lost business opportunities as a result of the
"smear campaign" lodged by Murchinson and Anson.  *See id.* ¶ 115.  While Nano had been in
discussions with EOS GmbH ("EOS") concerning potential business partnerships, EOS
"terminated these discussions . . . because of the mess with the Canadians (*i.e.*, Murchinson and
Anson)."  *Id.* ¶ 116.  Discussions with Desktop Metal were scrapped due to Murchinson's public
"campaign" against Nano.  *Id.* ¶ 117.  Nano's efforts to acquire another Israel-based company,
Stratasys, similarly broke down "partly as a result" of the "smear campaign" and Murchinson's
resistance to the acquisition.  *Id.* ¶¶ 119-120.

In addition to the conduct set forth above, the Amended Complaint alleges additional
facts that purportedly show Defendants' coordination.  First, it alleges that Murchinson and
Anson have each been accused in other proceedings of improperly trading the securities of
various companies.  *See id.* ¶¶ 57-65.  Second, it alleges one instance in which Anson and
Boothbay previously executed a similar trade of a company's securities, and two instances in
which Murchinson and Boothbay executed similar trades of other companies' securities.  *See id.*

¶¶ 68-71.  Third, it alleges that Murchinson and Anson's offices are located in close proximity in Toronto (whereas Boothbay is located in New York).  *See id.* ¶ 73.  Finally, the Amended Complaint alleges, without further context, that Twitter user "@BettingBruiser" posted that "Murchinson [has been] described by many to be a biz partner of Anson Funds."  *Id.* ¶ 74.

## III.   Procedural History

Prior to commencing the instant action, Nano and Murchinson commenced multiple proceedings in Israel.  Most notably, Nano commenced an action against Murchinson in Israel, seeking damages and a declaratory judgment that the Special Meeting was unauthorized.  *See* Am. Compl. ¶ 107.  That action remains ongoing in Israel.  *See* ECF No. 144 ("June Tr.") at 7:9-11.

On March 27, 2023, Plaintiff commenced this action by filing the initial Complaint.  *See* Compl.  Plaintiff filed a motion for a preliminary injunction on April 24, 2023.  *See* ECF Nos. 47-48.  The Court held a conference for the preliminary injunction motion on May 2, 2023. *See* ECF No. 74.  Also on May 2, 2023, Murchinson and Anson amended their latest Schedule 13Ds to disclose the instant action and append a copy of the Complaint.  *See* Am. Compl. ¶ 176; Murchinson May 13D; ECF No. 92-1 (the "Anson May 13D").  On June 1, 2023, Defendants filed motions to dismiss the Complaint and opposed the preliminary injunction motion.  *See* M&A MTD1; B. MTD1.  The parties fully briefed the motions to dismiss and preliminary injunction motions, including by filing proposed findings of fact and conclusions of law.  *See, e.g.*, *supra* n.1; ECF Nos. 86, 97, 108, 109, 112, 113, 116.

On June 22, 2023, Plaintiff amended the Complaint as of right.  *See* Am. Compl.  The Amended Complaint asserts substantially similar claims and facts as the Complaint.  *See generally id.* ¶¶ 197-242.  First, it alleges that Defendants violated the Exchange Act § 13(d), 15

U.S.C. § 78m(d) ("Section 13(d)") by failing to file accurate Schedule 13Ds when the beneficial ownership of Nano ADSs held by the "group" exceeded five percent. *Id.* ¶¶ 197-210 ("Count I"). Second, it alleges that Murchinson and Anson violated Section 13(d) by filing 13Ds that were false and misleading. *Id.* ¶¶ 211-224 ("Count II"). Third, it alleges that Defendants breached their deposit agreements governing the ownership of ADSs when they failed to file Schedule 13Ds and called the Special Meeting. *Id.* ¶¶ 225-231 ("Count III"). Finally, it alleges tortious interference with business relations, *id.* ¶¶ 232-238 ("Count IV"), and unjust enrichment, *id.* ¶¶ 239-242 ("Count V"). Among other relief, the Amended Complaint seeks an order compelling Defendants to file accurate Schedule 13Ds that disclose their group status; enjoining Defendants "from acquiring further shares of Nano, voting their existing shares, making any tender offer or proxy solicitation, or making any effort to change or affect control of Nano pending completion" of the Schedule 13Ds and "a reasonable 'cooling off' period"; disgorging Defendants' short-swing profits; and granting "injunctive relief to prevent further irreparable harm" to Nano. *Id.* at pp. 51-52 (a)-(k).

On June 23, 2023, Murchinson and Anson amended their Schedule 13Ds to disclose and append the Amended Complaint. *See* ECF Nos. 124-1 (the "Anson June 13D"), 125-1 (the "Murchinson June 13D"). The Court heard oral argument on June 23, 2023. On June 27, 2023, Defendants filed supplemental motions to dismiss the Amended Complaint. *See* M&A MTD2; B. MTD2. Plaintiff opposed those motions on June 29, 2023. *See* M&A Opp.2; B. Opp.2. Defendants filed their replies on June 30, 2023. *See* M&A Reply2; B. Reply. The parties subsequently submitted sur-replies without leave of Court. *See* ECF Nos. 142, 143.

Accordingly, now before the Court are Defendants' motions to dismiss and Plaintiff's preliminary injunction motion.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 680 (2009)).  The Court draws all reasonable inferences in the plaintiff's favor, and accepts as true all non-conclusory allegations of fact.  *Id.* However, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Determining whether a complaint states a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  Courts may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## DISCUSSION

Defendants seek dismissal on several grounds.  Among other arguments, Defendants principally contend that Plaintiff's federal securities claims fail because (i) Boothbay is not subject to Section 13(d) liability and (ii) Murchinson and Anson satisfied Section 13(d) by filing corrective disclosures.  Defendants argue that, once these federal claims are dismissed, the Court

should decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. The Court addresses these arguments in turn.

### I.  Heightened Pleading Standard

Before proceeding, the Court will address whether the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4(b)(1)-(3), and Rule 9(b) apply.  Plaintiff argues that the general pleading standard of Rule 8 applies, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a); *see* M&A Opp.1 at 10-11.  Defendants argue that a heightened pleading standard applies because Plaintiff's claims sound in fraud.  *See* M&A Br.1 at 7-8.

The PSLRA applies to "any private action arising under" 15 U.S.C. §§ 78a *et seq.*, including Section 13(d), "in which the plaintiff alleges the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading."  15 U.S.C. §§ 78u-4(b)(1).  In such an action, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *Id*. Similarly, Rule 9(b) requires that a plaintiff alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake."  The Second Circuit has read Rule 9(b) to require that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  The

wording of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Id*. at 171.  Rather, Rule 9(b) "applies when the claim sounds in fraud."  *Id*. at 167.

The Court concludes that Plaintiff's federal claims are subject to the PSLRA and Rule 9(b) because they "sound[] in fraud."  *Id*.; *see* M&A Br.1 at 7-8.  The crux of the Amended Complaint is an alleged scheme to take control of Nano by misleading the market and concealing information.  *See, e.g.*, Am. Compl. ¶¶ 134, 154, 217-218, 221-222.  These are precisely the types of allegations courts find "sound in fraud."  *See, e.g.*, *In re Crude Oil Commodity Litig.*, No. 06-cv-06677 (NRB), 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007) (applying Rule 9(b) to securities claims, in the absence of express allegations of fraud, because "the crux of plaintiffs' allegations is that defendants misled the market . . . by concealing its capacity and its actions, resulting in artificial prices").

Further, the Amended Complaint expressly and repeatedly alleges a "fraudulent" scheme and the "intentional misrepresentation and concealment of . . . information" as the basis for Plaintiff's Section 13(d) claims.  Am. Compl. ¶ 217; *see also id.* ¶¶134, 154.  It alleges that "Defendants concealed th[eir] creeping accumulation of Nano's shares by failing to file Schedule 13Ds and, when they did file, omitting material information."  *Id*. ¶ 134.  It alleges that "Defendants' fraudulent concealment of information regarding their creeping acquisition also had another purpose: evading safeguards put in place by Nano's Board of Directors to protect Nano's shareholders."  *Id*. ¶ 154.  The Amended Complaint alleges that, "[a]s a result of the Murchinson's intentional misrepresentation and concealment of this information, Murchinson's Schedule 13Ds were misleading and violated Section 13(d)."  *Id*. ¶ 217.  It alleges that "Anson similarly filed a false and misleading Schedule 13D."  *Id*. ¶ 218.  It further alleges that, "[a]s a

result of the Anson's intentional misrepresentation and concealment of this information, Anson's Schedule 13D was misleading and violated Section 13(d)." *Id*. ¶ 221; *see also id*. ¶¶ 231 ("Defendants' actions were . . . in furtherance of a conspiracy to . . . defraud the investing public …."), 238 (same). These allegations unquestionably sound in fraud and, therefore, are subject to the PSLRA and Rule 9(b). *See Rombach*, 355 F.3d at 167.

Plaintiff argues that a heightened pleading standard does not apply because "scienter" is not an element of Section 13(d) and courts have applied Rule 8 to such claims in other cases. M&A Opp.1 at 10-11. Plaintiff's argument fails on both points. First, Defendants do not argue, and the Court does not hold, that "scienter" is an element of Section 13(d) or that Section 78u-4(b)(2) of the PLSRA, which concerns allegations of "state of mind," applies. Rather, the Court finds that Rule 9(b) and Section 78u-4(b)(1), which addresses allegations of "[m]isleading statements and omissions," encompass the facts alleged in the Amended Complaint. Second, Plaintiff's reliance on a single unpublished decision to claim that courts "regularly apply the general standard to Section 13(d) claims" fails, as that decision does not discuss the PSLRA, Rule 9(b), or their applicability to Section 13(d). M&A Opp.1 at 11 (citing *Biofrontera AG v. Deutsche Balaton AG*, No. 18-cv-05237 (LAP), 2020 WL 1489788, at *1 (S.D.N.Y. Mar. 27, 2020)). Plaintiff has not cited any case holding that the PSLRA and Rule 9(b) cannot apply to Section 13(d) claims, especially where, as here, those claims comfortably rest on allegations of fraud.

Accordingly, Plaintiff's Section 13(d) claims are subject to the heightened pleading standards of the PLSRA and Rule 9(b). *See, e.g.*, *Vladimir v. Bioenvision, Inc.*, 606 F. Supp. 2d 473, 494 (S.D.N.Y. 2009) (applying heightened pleading requirements to Section 13(d) claims). However, even if the Rule 8 general pleading standard were applied, the Court finds that the

Amended Complaint still fails for the reasons set forth below.

## II. Counts I and II (Federal Claims)

Both of Plaintiff's federal claims arise under Section 13(d) of the Williams Act, which imposes certain disclosure requirements on holders of an issuer's securities. *See* Am. Comp. ¶¶ 197-224. The goal of Section 13(d) "is to alert the marketplace to every large, rapid aggregation or accumulation of securities . . . which might represent a potential shift in corporate control." *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971). Such disclosure is meant to create "a level playing field that does not unduly advantage either incumbent management or its challenger." *ICN Pharm., Inc. v. Khan*, 2 F.3d 484, 490 (2d Cir. 1993). The Supreme Court has cautioned, however, that Section 13(d) has a limited purpose – to provide information. *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58 (1975). It is not intended "to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts." *Id.*

Section 13(d) requires any "person" who acquires more than five percent of a firm's equity shares to file with the SEC a statement, known as a Schedule 13D, that discloses their identity and certain other information enumerated by statute. 15 U.S.C. § 78m(d)(1). A Schedule 13D must include: "(1) the background, identity, residence and citizenship of the purchaser; (2) the name of the issuer, class of securities and aggregate amount purchased or to be purchased; (3) the source and amount of funds or other consideration used or to be used in making the purchase; and (4) the purpose of the acquisition." *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 289 n.1 (2d Cir. 2011); *see also* 15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d-101. Section 13(d) imposes a similar disclosure requirement on any "group" that owns in the aggregate more than five percent of a firm's equity shares. 15 U.S.C.

§ 78m(d)(3).  A "group" is defined as "two or more persons [who] act as a partnership, limited

partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of

securities of an issuer."  *Id.*

Because the focus of Section 13(d) is the disclosure of information, "there is no private

damages remedy for issuers under § 13(d)."  *Hallwood Realty Partners, L.P. v. Gotham*

*Partners, L.P.*, 286 F.3d 613, 620 (2d Cir. 2002); *see Rondeau*, 422 U.S. at 51.  The only relief

available to private issuers under Section 13(d) is injunctive in nature, and it requires the issuer

to plead "irreparable harm to the interests which that section seeks to protect."  *CSX Corp.* 654

F.3d at 286 (quoting *Treadway Cos., Inc. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir. 1980)).

Those interests are "fully satisfied when the shareholders receive the information" required by

Section 13(d).  *Id.* at 286 (quoting *Treadway Cos., Inc.*, 638 F.2d at 380).

Here, Plaintiff argues that Defendants violated Section 13(d) because they formed a

"group" but failed to file Schedule 13Ds reflecting their group status and other pertinent

information, and because the Section 13Ds that Murchinson and Anson did file were false and

misleading.  Defendants argue that both theories fail.  Among other grounds for dismissal,

Defendants argue that the Section 13(d) claims should be dismissed because Boothbay does not

form part of a statutory "group," and Murchinson and Anson filed corrective disclosures

rendering the claims against them moot.

### A.  "Group" Status (Boothbay)

The parties agree that Boothbay, unlike Murchinson and Anson, owns less than five

percent of Nano ADSs.  A threshold question with respect to Boothbay, therefore, is whether it

formed a "group" with Murchinson and Anson.  If Boothbay did not, it had no obligation to file a

Schedule 13D, and the Section 13(d) claim against it must be dismissed.[5]  Plaintiff argues that

"circumstantial evidence," including Boothbay's investment advisory relationship with

Murchinson, supports treating them as a "group" for purposes of Section 13(d).  Boothbay argues

that its investment advisory relationship alone is insufficient, and that the Amended Complaint

does not plead other facts that make Boothbay part of a group.  The Court agrees that the

Amended Complaint does not plausibly allege that Boothbay is part of a "group" subject to

Section 13(d) liability.

A Section 13(d) "group" is formed when shareholders "agree to act together for the

purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R.

§ 240.13d-5(b)(1).  An agreement "may be formal or informal and may be proved by direct or

circumstantial evidence." *Morales v. Quintel Ent. Inc.*, 249 F.3d 115, 124 (2d Cir. 2001).

"[T]he touchstone of a group within the meaning of section 13(d) is that the members combined

in furtherance of a common objective." *CSX Corp.*, 654 F.3d at 283 (quoting *Roth v. Jennings*,

489 F.3d 499, 508 (2d Cir. 2007)).  "Even if many of the parties' 'activities' were the result of

group action, two or more entities do not become a group within the meaning of section 13(d)(3)

unless they 'act as a . . . group for the purpose of acquiring [holding, voting or disposing of]

securities of an issuer." *Id.* at 284 (quoting 15 U.S.C. § 78m(d)(3)).

---

[5] As a second threshold issue, Boothbay argues that it is not the "beneficial owner" of any Nano ADSs, while Plaintiff contends that Boothbay is a "beneficial owner" of up to 2.76 percent of Nano securities.  *See* B. Br.2 at 7-9; B. Opp.2 at 4-10; *see also* Am. Compl. ¶ 78.  The Court need not reach this issue because, even assuming Boothbay is the beneficial owner of the securities alleged, it would not be subject to Section 13(d) liability unless it formed part of a "group" that acquired more than five percent of securities in Nano.  *See* 15 U.S.C. § 78m(d) (imposing liability on any "person" or "group" that acquires more than five percent of a firm's securities).

A plaintiff alleging a "group" must plead "enough factual matter (taken as true) to suggest that an agreement was made." *Chechele v. Scheetz*, 819 F. Supp. 2d 342, 346-47 (S.D.N.Y. 2011), *aff'd*, 466 F. App'x. 39 (2d Cir. 2012). "An investment advisory client does not form a group with its investment advisor by merely entering into an investment advisory relationship." *Rubenstein v. Int'l Value Advisers, LLC* ("*Rubenstein*"), 959 F.3d 541, 546-47 (2d Cir. 2020). Allegations of parallel investment decisions or pre-existing relationships also do not suffice to plead a group. *See Schaffer v. CC Invs., LDC*, 115 F. Supp. 2d 440, 444 (S.D.N.Y. 2000); *Transcon Lines v. A.G. Becker Inc.*, 470 F. Supp. 356, 375 (S.D.N.Y. 1979).

Here, the Court finds that Plaintiff has not alleged facts sufficient to show that Boothbay entered a Section 13(d) group. The Amended Complaint nowhere alleges that Boothbay has expressly "agree[d] to act together [with Murchinson and Anson] for the purpose[s] of acquiring, holding, voting or disposing equity securities" of Nano. 17 C.F.R. § 240.13d-5. While Count I alleges that "Murchinson, Anson, and Boothbay have acted together," even that conclusory allegation conspicuously omits that they "agreed" to act. Am. Compl. ¶ 205. The facts alleged are insufficient to infer such an agreement.

Plaintiff principally urges the Court to infer a group from the fact that Murchinson "controls" Boothbay's holdings. *See* B. MTD Opp.1 at 8-9; B. MTD Opp.2 at 1-3. Specifically, the Amended Complaint alleges that "Murchison controls Boothbay's investment in Nano and acts as Boothbay's legal agent," including by signing the demand for the Special Meeting on Boothbay's behalf. Am. Compl. ¶ 24. Plaintiff alleges that, according to Boothbay, Boothbay "entered into an Investment Management Agreement ('IMA') with Murchinson" under which Murchinson "manages Boothbay's holdings" and Boothbay retains a right to "regain" "investing discretion and voting power" for "good reason." *Id.* ¶¶ 180-181. The Amended Complaint does

not allege that Boothbay's relationship with Murchinson is specific to Nano, but rather that it "extends beyond" securities in Nano to investment advice over private funds.  *Id.* ¶ 24.

The investment advisory relationship between Boothbay and Murchinson is by itself insufficient to infer a Section 13(d) group.  In *Rubenstein v. International Value Advisers, LLC*, the Second Circuit held that "[a]n investment advisory client does not form a group with its investment advisor by merely entering into an investment advisory relationship."  959 F.3d at 546-47.  Considering the "text and structure" of the Williams Act, the Second Circuit concluded that it was "simply wrong" to contend that entering into "an investment management agreement under which [a customer] gave the [manager] discretionary authority to trade securities in his account and agreed to pay them a fee for these services" constituted a Section 13(d) group.  *Id.* at 546.  It held that an essential element of a "group" is "an agreement . . . to trade the securities of *a particular issuer*," meaning an investment advisory relationship that is not specific to a particular issuer does not suffice.  *Id.* (emphasis added).  A contrary rule, the Second Circuit held, would "not serve the purpose of the statute, which is to 'prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading' the requirements of the statute."  *Id.* at 547 (internal citation omitted).  The Second Circuit held that its ruling would not frustrate Section 13(d)'s disclosure requirements for the additional reason that "[a]dvisors who purchase a sufficient quantity of a security in their clients' managed accounts will become subject to Section 13(d)'s disclosure requirement even if they do not form an insider group with their clients."  *Id.* at 548.  As a result, the Second Circuit affirmed the district court's dismissal of the complaint because it failed to allege a Section 13(d) group between parties to an investment advisory relationship.  *Id.* at 551.

As in *Rubenstein*, the Amended Complaint alleges an investment advisory relationship between Boothbay and Murchinson.  *See, e.g.*, Am. Compl. ¶¶ 24, 180-181.  Also as in *Rubenstein*, the Amended Complaint alleges no facts from which the Court could reasonably infer that the relationship is "to trade the securities of a particular issuer," i.e., Nano.  *Rubenstein*, 959 F.3d at 546.  Instead, the Amended Complaint alleges the opposite: "Boothbay's close relationship with Murchinson extends beyond their coordination with respect to Nano."  Am. Compl. ¶ 24.  As the Second Circuit contemplated in *Rubenstein*, Murchinson also disclosed the Nano securities held in its clients' "managed accounts" on its own Schedule 13D.  959 F.3d at 548; *see, e.g.*, Murchinson June 13D at 11 (Murchinson disclosing Nano securities "held through the Managed Positions").  In sum, the allegations of investment "control" fare no better here than in *Rubenstein*.

The remaining facts alleged in the Amended Complaint fall short of alleging that Boothbay entered into any Section 13(d) group.  The allegations that Boothbay's holdings in Nano increased alongside Murchinson's, and that Murchinson acted as Boothbay's "agent," are merely consistent with their investment advisory relationship that gave "Murchinson control[] [of] Boothbay's investment in Nano."  Am. Comp. ¶¶ 23, 69.  *See, e.g.*, *Rubenstein v. Rofam Inv. LLC* ("*Rofam*"), 805 F. App'x. 75, 77 (2d Cir. 2020) (concluding that manager "execut[ing] short-swing trades in Sears stock on its clients' behalf" did not support a Section 13(d) group in the absence of an "issuer-specific" investment management agreement).  Although Plaintiff argues in its reply to the supplemental motion to dismiss that the alleged "power of attorney" between Boothbay and Murchinson was "a second, issuer specific agreement" (B. MTD Opp.2 at 2-3), the Amended Complaint does not allege that this relationship was specific to Nano, nor does Plaintiff cite any authority for treating a power of attorney as functionally equivalent to an

issuer-specific *investment management agreement* for purposes of Section 13(d).  To the contrary, courts have concluded that such an agency relationship is insufficient to form a group. *See, e.g.*, *Greenfield v. Criterion Cap. Mgmt., LLC*, No. 15-cv-03583 (PJH), 2017 WL 2720208, at *6 (N.D. Cal. June 23, 2017) (dismissing complaint because allegations that investment manager "acted as the 'agent'" and engaged in "lockstep . . . parallel investment activity" as other member of an investment management agreement fell short of a Section 13(d) "group").

The Amended Complaint next alleges "coordinated trading activity" between Murchinson and Boothbay with respect to issuers *other* than Nano, including Benessere Capital Acquisition Corp. and Immix Biopharma, Inc.  Am. Compl. ¶¶ 67-70.  This activity, however, only bolsters the conclusion that their investment advisory relationship is not for the purpose of any *particular* issuer and that this case falls squarely under *Rubenstein*.  Finally, the Amended Complaint alleges a single incident of "coordinated . . . trading positions" between Boothbay and Anson in a special purpose acquisition company before their acquisition of Nano securities.  *Id.* ¶ 71.  But Plaintiff has not relied on this allegation in its brief to argue for Section 13(d) group liability.  *See generally* B. MTD Opp.1; B. MTD Opp.2.  In any event, "[g]eneral allegations of parallel investments" do not suffice to plead a group.  *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 415 (S.D.N.Y. 2006).

Courts have dismissed complaints containing more compelling "group" pleading than exists in the Amended Complaint with respect to Boothbay.  In *Augenbaum v. Anson Investments Master Fund LP*, the court rejected the plaintiff's argument that the defendants formed a Section 13(d) group by entering into a securities purchase agreement together, engaging in parallel investments, and using the other defendant as an agent.  No. 22-cv-00249 (VM), 2023 WL 2711087, at *6 (S.D.N.Y. Mar. 30, 2023).  The court reasoned that, like here, the plaintiff had

"not alleged that any communications or interactions among the Moving Defendants took place that would plausibly show concerted or coordinated activity." *Id.* at *9. Similarly, in *Forward Industries, Inc. v. Wise*, the court found allegations that the defendants "formed a secret 'group' for the purpose of taking over the company," had a "longstanding business relationship," executed joint investments in other transactions, and invited each other to the issuer's shareholder meetings failed to show a Section 13(d) group sufficient to withstand a motion to dismiss. No. 14-cv-05365 (JSR), 2014 WL 6901137, at *4 (S.D.N.Y. Sept. 23, 2014); *see also Chechele*, 819 F. Supp. 2d at 347 (dismissing complaint alleging parties entered agreements on specific dates because "bare allegations that the parties 'agreed that they . . . would maintain control of [the issuer]' will not, without more, suffice" to plead a "group"); *Lowinger v. Morgan Stanley & Co. LLC*, 43 F. Supp. 3d 369, 376-77 (S.D.N.Y. 2014), *aff'd*, 841 F.3d 122 (2d Cir. 2016) (dismissing complaint because "[t]he fact that two groups benefited" or "are similarly situated in goals or interests does not plead the existence of a Section 13(d) group"); *Schaffer v. CC Invs., LDC*, 115 F. Supp. 2d 440, 444 (S.D.N.Y. 2000) (dismissing complaint because "the facts appear to demonstrate nothing more than parallel investment decisions by defendants").

One needs to look no further than Plaintiff's allegations that Murchinson and Anson formed a group to discern additional facts Plaintiff might have, but did not, allege with respect to Boothbay. By way of illustration, the Amended Complaint alleges on information and belief that Anson twice purchased Nano securities in close proximity to, and based on material non-public information that, Murchinson had offered to purchase Nano. *See, e.g.*, Am. Compl. ¶¶ 82-85, 95-96. It further alleges that Murchinson and Anson engaged in coordinated short-swing trades in early 2023, at the same time that Murchinson and Anson both acquired more than five percent of Nano securities, both issued public statements critical of Nano's corporate governance, and

both "staged" the Special Meeting.  *See, e.g.*, *id.* ¶¶ 108-113, 116, 125-128.  While the Court

need not decide whether such allegations are sufficient to plead a group between Murchinson and

Anson because the Section 13(d) claims against them fail for other reasons, *see infra* Discussion

§ 2(B), they underscore the dearth of facts alleged with respect to Boothbay.

      Accordingly, Plaintiff's Section 13(d) claim against Boothbay is dismissed because the

Amended Complaint fails to plead that Boothbay was part of a "group" or otherwise held over

five percent of securities in Nano.  *See Rubenstein*, 959 F.3d at 546-549.

### B.  Mootness (Murchinson and Anson)

      The parties dispute whether the Section 13(d) claims against Murchinson and Anson are

moot in light of their amended disclosures.  Plaintiff argues that the Section 13(d) claims are not

moot and that they provide a basis for the Court to compel additional disclosures and injunctive

relief.  *See* M&A Opp.1 at 15-19; M&A Opp.2 at 8-12.  Murchinson and Anson argue that under

*Avnet, Inc. v. Scope Industries*, 499 F. Supp. 1121 (S.D.N.Y. 1980), and its progeny, disclosure

of the issuer's pleading in an amended Schedule 13D is sufficient to render Section 13(d) claims

moot where, as here, the parties have a "good faith" dispute as to the information to be disclosed.

M&A Br.1 at 9-12; M&A Br.2 at 1-5.  Defendants also argue that the Amended Complaint fails

to allege a basis for injunctive relief beyond the corrective disclosures that were already made.

*See id*.

      In accordance with the limited purpose of the Williams Act, there is generally no basis

for relief under Section 13(d) once the information in question is disclosed.  *See*, *e.g.*, *Treadway*

*Cos.*, 638 F.2d at 380 ("Since the informative purpose of § 13(d) had thereby been fulfilled [by

an amended disclosure], there was . . . no basis for . . . relief.").  Where there is a good faith

dispute as to the information to be disclosed, Section 13(d) "requires only that the disputed facts

and possible outcomes be disclosed." *Cartica Mgmt., LLC v. CorpBanca, S.A.*, 50 F. Supp. 3d 477, 495-96 (S.D.N.Y. 2014). In such a case, an amended Schedule 13D that annexes the complaint, explains the issuer's allegations, and refutes those allegations, is sufficient. *See id.* at 496 ("The disclosures, which explain Cartica's complaint, refute the allegations, and disclaim that Itaú has formed a group with the Corp Group defendants, were sufficient."); *Taro Pharm. Indus., Ltd. V. Sun Pharm. Indus., Ltd.*, No. 09-cv-08262 (PGG), 2010 WL 2835548, at *10 (S.D.N.Y. July 13, 2010) ("[T]he courts that have considered this issue have generally held that annexing a copy of a complaint to an amended filing is sufficient to satisfy Williams Act requirements and moot any Williams Act claim.").

Here, Murchinson and Anson disclosed Plaintiff's initial Complaint, along with their good faith dispute of its merit, in amended Schedule 13Ds on May 2, 2023. *See* Am. Compl. ¶ 176; Murchinson May13D; Anson May 13D. The Murchinson May 13D disclosed that:

> In addition to the Israeli litigation, on March 27, 2023, the Issuer filed a lawsuit in the United States District Court for the Southern District of New York (the "Issuer Complaint") against certain of the Reporting Persons and certain other third parties (collectively, the "Defendants"). The following description of the Issuer Complaint is qualified in its entirety by reference to the Issuer Complaint, which is attached as Exhibit 99.1 hereto and is incorporated herein by reference. The Issuer Complaint alleges, among other things, (i) violations of the reporting requirements of Section 13(d) of the Securities and Exchange Act of 1934, as amended (the "Act"), (ii) breach of contract with respect to the Issuer's Amended and Restated Deposit Agreement dated April 15, 2019, (iii) tortious interference with certain of the Issuer's business relations, and (iv) unjust enrichment. The gravamen of the Issuer Complaint is that Defendants failed to disclose that they formed a "group" as defined under Section 13(d) of the Act and seeks permanent injunctive relief and damages. The Reporting Persons believe the allegations set forth in the Issuer Complaint are without merit and intend to defend themselves vigorously.

Murchinson May 13D at 10. Murchinson's disclosure proceeded to discuss the relief sought by

Plaintiff and developments in this litigation.  *Id.* at 10-11.  Anson's amended Schedule 13D

similarly disclosed Plaintiff's claims and Anson's defense.  *See* Anson May 13D at 9.

On June 23, 2023, Murchinson and Anson filed additional amendments to their Schedule

13Ds, disclosing Plaintiff's Amended Complaint that was filed in this action one day earlier.  *See*

Anson June 13D; Murchinson June 13D.  Both Murchinson and Anson's amended Schedule

13Ds appended Plaintiff's pleadings in full – first the initial Complaint and then the Amended

Complaint – providing members of the public the opportunity to assess the information

themselves.  *See* Murchinson May13D; Anson May 13D; Anson June 13D; Murchinson June

13D.  The appended pleadings describe in detail Nano's allegations concerning coordination

between Murchinson, Anson, and Boothbay, and the legal reasons why Nano believes

Defendants constitute a "group" under Section 13(d).  *See* Compl.; Am. Compl.

Defendants vigorously dispute Plaintiff's allegations and claims.  In connection with the

pending motions alone, the parties have filed over 200 documentary exhibits plus extensive

proposed findings of fact and conclusions of law setting forth their diametrically opposed

positions in this dispute, which has spawned multiple lawsuits both here and in Israel.

Murchinson and Anson dispute the claims that they formed a "group" for purposes of Section

13(d), that they failed to disclose material information, or that they otherwise are in violation of

the securities laws.  *See, e.g.*, M&A Br.1; M&A Br.2.  Murchinson and Anson therefore have

made successive amendments disclosing Plaintiff's claims and their good faith dispute of those

claims.  Section 13(d) requires no more in this case.  *See Cartica Mgmt., LLC*, 50 F. Supp. 3d at

495-96.

Courts have long found Section 13(d) claims moot where, like here, defendants file

amended Schedule 13Ds appending a copy of the complaint.  Over 40 years ago, in *Avnet, Inc. v.*

*Scope Industries*, the court held that an amended Schedule 13D informing the public of claims asserted by the plaintiff and the conflicting positions of the parties was sufficient to moot a Section 13(d) claim.  499 F. Supp. at 1124.  The court reasoned that, where "a genuine and vigorous dispute exists as to whether the material which the plaintiff alleges is required to be disclosed is actually a fact," then defendants are "not required to state in their schedules that the alleged facts were actually true."  *Id.* at 1125.  "Instead, disclosure of the possibility of the alleged fact, and the conflicting positions taken by the parties [is] sufficient."  *Id.*  The court therefore dismissed the Section 13(d) claim because, like here, the defendant amended its Schedule 13D, which "sufficiently inform[ed] [the plaintiff] shareholders of . . . the parties' positions" on the information to be disclosed.  *Id.* at 1126.

Similarly, in *Cartica Management*, the plaintiff there, like Plaintiff here, brought a Section 13(d) claim alleging that the defendant failed to disclose its "group" status, among other information.  50 F. Supp. 3d at 495.  Like here, the defendant amended its Schedule 13D by annexing a copy of the complaint and reciting and refuting the plaintiff's contentions.  *Id.* at 483, 495.  Relying on *Avnet*, the court found that "[t]he disclosures, which explain Cartica's complaint, refute the allegations, and disclaim that Itaú has formed a group with the Corp Group defendants, were sufficient."  *Id.* at 496.  In rejecting the same argument made by Plaintiff here – that an amended disclosure is inadequate if it merely attaches and refutes the plaintiff's allegations – the court reasoned that "a party is not required to admit allegations in a Schedule 13D that it disputes in good faith."  *Id.* at 494.  As a result, the court dismissed the plaintiff's Section 13(d) claim as moot.  The same result applies here.

Likewise in *Lions Gate Entertainment Corp. v. Carl C. Icahn*, the plaintiff brought a Section 13(d) claim, and the defendants responded by filing an amended Schedule 13D attaching

the plaintiff's complaint.  No. 10-cv-08169 (HB), 2011 WL 1217245 (S.D.N.Y. Mar. 30, 2011).

The court recognized that "[c]ourts in this District and elsewhere have held that in an action

claiming a failure to disclose under [Section 13(d)], a defendant's filing an amendment to its

Schedule 13D and attaching plaintiff's complaint is 'sufficient to satisfy Williams Act

requirements and moot any Williams Act claim.'"  *Id.* at *1 (internal citation omitted).  The court

therefore dismissed the plaintiff's Section 13(d) claim as moot in light of the defendants'

amended disclosure.  *Id.* at *2.

In *Taro Pharmaceutical Industries, Ltd.*, the court similarly dismissed as moot a Section

13(d) claim after the defendant filed an amended Schedule 13D that attached, and refuted, the

plaintiff's complaint.  2010 WL 2835548.  In reaching its conclusion, the court reasoned that the

"Williams Act is not designed to force the tender offeror to admit the target company's

underlying violations."  *Id.* at *9.  Rather, appending the complaint to an amended disclosure

provides shareholders "with the 'pertinent information' that the Williams Act requires, and it will

be up to them to 'decide for themselves' the significance of that information.'  The Act requires

no more."  *Id.* (internal citation omitted).  As a result, the court dismissed the Section 13(d)

claims as moot.  *Id.* at *17; *see also Tanzanian Royalty Expl. Corp. v. Crede CG III, Ltd.*, No.

18-cv-04201 (LGS), 2019 WL 1368570, at *13 (S.D.N.Y. Mar. 26, 2019) (dismissing Section

13(d) claims because the interests of Section 13(d) "are fully satisfied when the shareholders

receive the information" as the "corrective filings cure Crede's failure to file timely Schedule

13Ds.").

Consistent with this line of cases, courts have denied requests for injunctive relief, even

before a motion to dismiss is filed, where the defendant discloses a copy of the plaintiff's

complaint and thereby renders further relief under Section 13(d) moot.  In *Condec Corp. v.*

*Farley*, for example, the court declined to enter relief on the plaintiff's Section 13(d) claim because the defendant had already amended their Schedule 13D with "a full recitation of the issues raised" in the litigation, meaning any further amendment would accomplish no more than a "confession of judgment" from the defendant, a result inconsistent with the purpose of the Williams Act.  573 F. Supp. 1382, 1386 (S.D.N.Y. 1983); *see also Kaufman v. Cooper Cos.*, 719 F. Supp. 174, 182 (S.D.N.Y. 1989) ("Because the 13D statements have been filed, albeit belatedly, there is no injunctive relief that can be issued by this court to correct the delayed disclosure.  The issue as to timeliness is therefore moot."); *Drobbin v. Nicolet Instrument Corp.*, 631 F. Supp. 860, 913 (S.D.N.Y. 1986) ("Couri's initial failure timely to file a Schedule 13D . . . was cured by the filing of such a document on June 24.  It is well-settled that once the informative purpose of § 13(d) has been fulfilled by curative disclosure, there is no risk of irreparable injury to shareholders and no basis for injunctive relief."); *Cap. Realty Inv'rs Tax Exempt Fund, Ltd.'s. v. Dominium Tax Exempt Fund L.L.P.*, 944 F. Supp. 250, 260 (S.D.N.Y. 1996) (stating that, once amended disclosures are issued, "any misleading impressions created to date should be overcome, and the fate of the mergers will be for the BAC holders to decide"); *Ranger Oil Ltd. v. Petrobank Energy & Res. Ltd.*, No. 00-cv-03139 (SHS), 2000 WL 33115906, at *11 (S.D.N.Y. May 23, 2000) (finding that "any deficiency in Petrobank's disclosure has been ameliorated by Petrobank's inclusion of the entire amended complaint" in a disclosure to shareholders).  Accordingly, Plaintiff's Section 13(d) claims against Murchinson and Anson are moot.

The Court is not persuaded by Plaintiff's contrary arguments.  Plaintiff first argues that attaching a complaint to an amended Schedule 13D is sufficient only where "serious questions" regarding "legal" issues exist.  M&A Opp.1 at 17.  However, the weight of authority – including

cases cited by Plaintiff – unequivocally hold that a Section 13(d) claim is moot where, like here, the defendant discloses the issuer's complaint in an amended Schedule 13D and raises a good faith dispute as to the facts or the law.  Plaintiff cites (*see* M&A Opp.1 at 19) *Cartica*, in which the court dismissed Section 13(d) claims upon the defendant filing an amended disclosure attaching a copy of the complaint, because there was a "good faith basis for disputing 'group' status" – the same dispute between the parties here.  50 F. Supp. 3d at 494.  Similarly, in *Taro Pharmaceutical Industries, Ltd.* (*see* M&A Opp.1 at 19), the court held that appending a complaint is sufficient to moot Williams Act violations even where not all facts or law are in dispute.  *See Taro Pharm. Indus., Ltd.*, 2010 WL 2835548, at *9, *17.

Plaintiff's reliance (M&A Opp.1 at 17) on *E.ON AG v. Acciona, S.A.* to argue that appending a complaint to a disclosure is insufficient to moot a Section 13(d) claim is misplaced.  468 F. Supp. 2d 537, 543 (S.D.N.Y. 2006) ("*E.ON AG I*").  In that case, the court "declined without explanation to dismiss a claim as moot despite the fact that the defendant had filed the amended complaint with the SEC."  *Lions Gate*, 2011 WL 1217245, at *2.  But the court subsequently held that the defendants' amendments had, collectively, cured the alleged disclosure issues.  *E.ON AG v. Acciona, S.A.*, 06-cv-08720 (DLC), 2007 WL 316874, at *10 (S.D.N.Y. Feb. 5, 2007) ("*E.ON AG II*").  The court reasoned that the lawsuit had "largely served its purpose" under the Williams Act by forcing the defendant to amend its disclosures with the information pertinent to shareholders, which is all that Section 13(d) requires.  *Id.* at *10-11.  Courts have since rejected arguments, like Plaintiff's here, that *E.ON AG I* requires more than disclosure of the parties' dispute to moot Section 13(d) claims.  *See, e.g.*, *Lions Gate*, 2011 WL 1217245, at *2 (rejecting reliance on *E.ON AG I* and noting that cases "decided subsequent to *E.ON AG* [have] affirmed the *Avnet* rule"); *Taro Pharm. Indus., Ltd.*, 2010 WL 2835548, at *9

(relying on *E.ON AG II* to find Section 13(d) claim moot upon disclosure of the complaint).

*Horsehead Resource Development Co. v. B.U.S. Environmental Services*, *Inc.*, also cited by Plaintiff (*see* M&A Opp.1 at 18), is similarly unavailing.  916 F. Supp. 305, 309-10 (S.D.N.Y. 1996), *opinion vacated in part*, 928 F. Supp. 287 (S.D.N.Y. 1996).  There, the court cited approvingly to *Avnet* and its progeny for the principle that a curative disclosure moots Section 13(d) claims, and that generally the "disclosure of the *possibility* of the alleged fact, and the conflicting positions taken by the parties," is sufficient.  *Id.* at 312.  However, it concluded that "the situation is different once a criminal case has been brought" regarding the defendants' investment in the issuer, as had been alleged there.  *Id*. at 313.  Here, by contrast, Plaintiff has not alleged the existence of criminal charges related to Defendants' investment in Nano. *Horsehead*'s narrow exception is, therefore, inapplicable.  *See, e.g.*, *Lions Gate*, 2011 WL 1217245, at *1 (rejecting the plaintiff's reliance on *Horsehead* because there was "no allegation that Defendants are involved in an ongoing criminal investigation related to their dealings with Lionsgate"); *Taro Pharm. Indus., Ltd.*, 2010 WL 2835548, at *14-15 (finding *Horsehead* to have "no applicability" because the plaintiff had "not alleged that any criminal prosecution . . . [was] presently ongoing").

Plaintiff's reliance (*see* M&A Opp.1 at 18) on two cases outside of the Second Circuit is equally misplaced.  Plaintiff cites *Meridian OHC Partners, LP v. Davis*, No. 16-cv-01161 (JAD) (CWH), 2018 WL 1368266 (D. Nev. Mar. 15, 2018), for the assertion that "disclosing the existence of adverse claims" is insufficient to moot Section 13(d) claims.  M&A Opp.1 at 18. However, the defendants there argued broadly that publicity of the lawsuit alone was sufficient, not that they had appended the operative pleading to an amended Schedule 13D.  *Id.* at *5. Furthermore, *Meridian* did not discuss *Avnet* or other authority applicable in this District.  *See*

*generally id. Meridian*, therefore, is inapposite. In *Warner Communications, Inc. v. Murdoch*, 581 F. Supp. 1482 (D. Del. 1984), the court relied on *Avnet* and held that, "if the party in good faith disputes the violations, the party need only disclose the possibility of the violations." *Id.* at 1502. But the court "defer[red] ruling upon the sufficiency of the disclosure" there because it concluded, without further reasoning, that it was unable to determine if a "good faith dispute" existed or to assess the sufficiency of the "brief disclosure . . . in the[] 13D Statement." *Id.* Here, the Court has found that a good faith dispute exists, and *Warner* does not compel a different result. *See, e.g.*, *Taro Pharm. Indus.*, 2010 WL 2835548, at *16 ("To the extent that this portion of *Warner Communications* suggests that where there exists a good faith dispute as to facts or an alleged legal violation, the Williams Act requires more than disclosure of the dispute, it is inconsistent with the weight of authority discussed above and will not be followed by this Court in this case.").

Plaintiff next argues that Murchinson and Anson's amended Schedule 13Ds "cannot retroactively cure the purchases that took place before," and that "[t]hese uncured violations continue to require the Court's action, including by voiding the votes Defendants purported to cast at the [Special Meeting] and divesting the shares they purchased after the group passed the 5% threshold." M&A Opp.1 at 16-17; *see* M&A Opp.2 at 8-11. This argument fails for multiple reasons. First, it is far from clear that such relief – retroactively voiding shareholder votes from a prior election and divesting securities purchased prior to a curative disclosure – is available on a Section 13(d) claim. Nearly 50 years ago, in *Rondeau*, the Supreme Court considered whether there was a basis under Section 13(d) for the district court in that case to enter an injunction "prohibiting petitioner and his codefendants from voting or pledging their stock and from acquiring additional shares, requiring them to divest themselves of stock which they already

owned, and for damages." 422 U.S. 49 at 55. The Supreme Court concluded that there was not. *Id.* at 65. It cautioned that Section 13(d) does not "provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts." *Id*. at 58. The Court emphasized that Section 13(d) provides only for injunctive relief, "which is historically 'designed to deter, and not to punish . . . .'" *Id.* at 62. Because the Section 13(d) violation there did not present a "danger of recurrent violation," the Supreme Court concluded that there was "no basis . . . for injunctive relief." *Id.* at 59, 65.

Since *Rondeau*, the Second Circuit has twice affirmed district court decisions holding that "disenfranchisement or divestiture" of securities was unavailable on Section 13(d) claims, while declining to resolve whether there is any set of circumstances where such relief might be appropriate. *See, e.g.*, *CSX Corp.*, 654 F.3d at 287 (concluding that share "sterilization" was not available under Section 13(d) without resolving "what remedies might be appropriate when disclosure that is timely with respect to a proxy contest is not made"); *Treadway Cos.*, 638 F.2d at 380 n.45 (affirming denial of injunctive relief while taking "no view" on whether "disenfranchisement or divestiture" might be available if a defendant obtained a degree of effective control of the issuer). Courts have recognized that the focus of relief under Section 13(d) is forward-looking and generally not retrospective in nature, consistent with the statute's informational purpose. *See, e.g.*, *E.ON AG II*, 2007 WL 316874, at *9 ("[I]n addressing a request for injunctive relief, as opposed to damages, the focus [under Section 13(d)] is on current and future shareholders, and not on those who may have sold 'at an unfairly depressed price.'" (citing *Rondeau*, 422 U.S. at 60)).[6] Notably, when urged by the Court at oral argument, Plaintiff

---

[6] The focus on forward-looking relief for Section 13(d) accords with traditional principles of equity that limit injunctive relief to *future* violations. *See, e.g.*, *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952) ("The sole function of an action for injunction is to forestall

could not cite a single decision from the Second Circuit (or from any court in the past 35 years) that granted such relief under Section 13(d), nor has Plaintiff cited such precedent in its hundreds of pages of briefing to the Court.  *See* June Tr. at 26:15-23.

Second, even if Plaintiff's Section 13(d) claims against Murchinson and Anson were not moot, and assuming that the "retroactive[]" relief Plaintiff seeks is permissible under Section 13(d), the Amended Complaint pleads no basis for such relief in this case as to any Defendant. *See* Rule 8(a)(2) ("A pleading that states a claim for relief must contain a short and plain statement of the claim *showing that the pleader is entitled to relief*." (emphasis added)).  The relief sought in the Amended Complaint with respect to the votes cast at the Special Meeting is forward-looking and not merely retroactive as Plaintiff argues in its briefs.  *See, e.g.*, Am. Compl. ¶¶ 184 ("Nano will suffer irreparable harm if Defendants are permitted to give legal impact to the votes they unlawfully cast . . . ."), 186 ("Defendants' interference with fair elections and threats to take control of Nano . . .  would be impossible to undo after the fact."), 189 ("Defendants' attempts to use their unlawful votes to seat directors violates . . . the U.S. securities laws").  However, Murchinson and Anson voluntarily filed corrective disclosures, providing the public with the pertinent information to assess such a corporate take-over if it occurs and rendering such relief under Section 13(d) unavailable.

Further, the parties agree that "[t]he only situation in which" injunctive remedies beyond corrective disclosures "may be permissible remedies for Section 13(d) violations is when the

---

future violations."); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 364 (S.D.N.Y. 2020) ("This principle is a corollary to the most basic rule of preventive injunctive relief – that the plaintiff must show a cognizable risk of future harm." (internal citation omitted)); *Fisher v. Goord*, 981 F. Supp. 140, 168 (W.D.N.Y. 1997) ("A preliminary injunction cannot be issued based on past harm.  The purpose of a preliminary injunction is to prevent *future* irreparable harm.").

defendant obtains effective control of plaintiff through stock purchases before it comes into compliance with Section 13(d)." *Raybestos-Manhattan, Inc. v. Hi-Shear Indus.*, 503 F. Supp. 1122, 1133 (E.D.N.Y. 1980); *see* M&A Opp.1 at 16 (Plaintiff citing *Raybestos-Manhattan* for this standard); M&A Br.2 at 4 (Defendants stating similar standard). But that situation is not present here. The Amended Complaint does not allege facts sufficient to show Defendants obtained a degree of effective control over Nano before filing their curative Schedule 13Ds. At most, it alleges that Defendants obtained, collectively, between 11.04 percent and 13.80 percent of Nano's ADS. *See* Am. Compl. ¶¶ 78-79. It also alleges that Murchinson sought "to amend Nano's articles of association and oust four of its board members" at the Special Meeting. *Id.* ¶ 104. But the Amended Complaint nowhere alleges that Defendants obtained anything near a controlling share of Nano ADSs. Nor does it allege that Defendants sought to (or in fact did) replace a majority of Nano's board members. Instead, Murchinson's Schedule 13Ds indicate that only two of Nano's nine board members were replaced and two others removed at the Special Meeting. *See* Murchinson March 13D, Ex. 1 at 12. Plaintiff cites no case where a court found that a degree of effective control had been obtained under similar circumstances. *See* M&A Opp.2 at 10-11.

The Second Circuit has found a greater degree of control than is alleged in the Amended Complaint insufficient for Section 13(d). In *Treadway*, the defendant acquired nearly one-third of the issuer's securities before filing any Schedule 13D. 638 F.2d at 365. The Second Circuit determined that the defendant "never had 'a degree of effective control' over Treadway," and "disenfranchisement or divestiture" of shares was therefore unavailable as a matter of law. *Id.* at 380 n.45. The Second Circuit explained that "Treadway's other shareholders, now fully informed about Care's intentions, remain[ed] free to accept or reject Care's overtures." *Id.*

Here, too, Nano's other investors remain free to accept or reject Defendants' overtures.

Relying on *Treadway*, the court in *Tanzanian Royalty* likewise held that the plaintiff was "not entitled to any relief under § 13(d)" because the complaint did not allege "a potential shift in corporate control." 2019 WL 1368570, at *13. The court defined "control" as the power to "direct or cause the direction of the management and policies" of a company. *Id.* (quoting 17 C.F.R. § 240.12(b)-2(f)). Because the complaint there, like here, did not indicate a change in such control, the court concluded that it did "not raise a claim for injunctive relief under § 13(d)" and dismissed the claim. *Id.*

Similarly, in *Raybestos-Manhattan, Inc. v. Hi-Shear Industries*, which Plaintiff affirmatively cites, the court held that the "limitations placed upon injunctive remedies under Section 13(d)" foreclosed injunctive relief because the plaintiff failed to show that the defendant had obtained effective control of the issuer before satisfying their disclosure obligations. 503 F. Supp. at 1133. The court observed that other "courts finding Section 13(d) violations have not enjoined defendants from gaining corporate control through tender offers after the Section 13(d) violation has been corrected." *Id.* As in *Raybestos-Manhattan*, Plaintiff has not alleged that Defendants obtained effective control of Nano before satisfying Section 13(D) – or since.

Aside from *Raybestos-Manhattan*, Plaintiff cites three cases to argue that retroactive injunctive relief is available despite corrective disclosures under Section 13(d). *See* M&A Opp.1 at 16. All three cases, however, are more than 35 years old, from courts outside of the Second Circuit applying inapposite law, and two are unpublished. In *Clarostat Manufacturing Co. v. Ostrau*, No. C82-299-L, 1983 WL 1315, at *1 (D.N.H. May 26, 1982), the court granted a temporary restraining order while relying, in part, on the principle that "the violation of Section [13](d) in and of itself constitutes irreparable harm," which was rejected by the Supreme Court in

*Rondeau.  Champion Parts Rebuilders, Inc. v. Cormier Corp.*, 661 F. Supp. 825, 830 (N.D. Ill.

1987), similarly relied on considerations inappropriate post-*Rondeau* and the defendant there,

unlike here, owned "42% of Campion shares . . . when they demanded that the entire Champion

Board resign."  *See also CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d

511, 572 n.335 (S.D.N.Y. 2008) (rejecting the plaintiff's reliance on *Champion* because it "relied

on considerations that are inappropriate after *Rondeau*).  Finally, *Financial General Bankshares,

Inc. v. Lance*, No. 78-0276, 1978 WL 1082, at *13 (D.D.C. Apr. 27, 1978) supports the Court's

determination.  In *Financial General Bankshares*, the court circumscribed the "broad relief"

sought by the plaintiff because there, like here, the defendants had not "obtained effective control

of [the issuer] as a result of purchases made while not complying with section 13(d)," such that

"disenfranchisement or divestiture" was *not* appropriate.  *Id.*

Consistent with *Treadway* and *Raybestos-Manhattan*, courts in the Second Circuit have

consistently rejected efforts by issuers to divest the shares or votes of investors that did not

obtain sufficient control of the issuer until after satisfying Section 13(d).  *See, e.g.*, *CSX Corp.*,

562 F. Supp. 2d at 570-71, 574 (holding that the court "is foreclosed as a matter of law from

enjoining defendants from voting" shares they acquired before Section 13(d) compliance because

"the alteration of the corporate electorate arguably effected by defendants' actions" did not give

defendants "a degree of effective control"); *Drobbin*, 631 F. Supp. at 913-14 & n.3 (denying

request to sterilize shares because investors "did not obtain a degree of effective control through

their purchases of Braintech stock until after" their 13D disclosure was made); *Lawrence Grp.,

Inc. v. Mech. Tech., Inc.*, No. 96-cv-00773, 1996 WL 679881, at *3 (N.D.N.Y. Oct. 17, 1996)

(dismissing Section 13(d) claims reasoning that it cannot "be said that seeking the election of

two directors out of six constitutes a 'squeezing out' of minority shareholders"); *cf. Telenor E.*

*Invest AS v. Altimo Holdings & Invs. Ltd.*, 567 F. Supp. 2d 432, 446 (S.D.N.Y. 2008) (finding amended disclosure "arguably d[id] not render Telenor East's claims moot" because, by the time the amended disclosure was issued, "Eco Telecom was poised to cross the 44% threshold and did so within twelve days").  Plaintiff has presented no persuasive reason to depart from the weight of authority in the Second Circuit here.

Finally, this is not a case in which a plaintiff rushed to court to fend off irreparable harm from an impending shareholder or certificate-holder meeting in the absence of any Schedule 13D.  Rather, 10 days before the Special Meeting, Plaintiff sent a cease-and-desist letter to all Defendants asserting the same claims as in the Amended Complaint.  *See* ECF No. 133-2.[7] Plaintiff then waited until *after* the Special Meeting to file the initial Complaint on March 27, 2023, did not seek preliminary relief until April 24, and did not file the operative Amended Complaint until June 22.  *See* Compl.; ECF No. 47; Am. Compl.  Meanwhile, Murchinson and Anson collectively issued public statements and several Schedule 13Ds disclosing their acquisition of Nano ADSs and potential changes to Nano's corporate management.  This chronology and set of alleged facts are inconsistent with a showing of irreparable harm essential for relief under Section 13(d).  *See Rondeau*, 422 U.S. at 61 (holding that "irreparable harm" is a necessary element under Section 13(d)); *see, e.g.*, *Myers v. Am. Leisure Time Enters., Inc.*, 402 F. Supp. 213, 215 (S.D.N.Y. 1975), *aff'd*, 538 F.2d 312 (2d Cir. 1976) (dismissing Section 13(d) claim because the complaint failed to allege "that plaintiffs will suffer irreparable harm absent injunctive relief, and the facts plaintiffs allege, even accepted as true for the purpose of this

---

[7] Without objection, the Court takes judicial notice that the cease-and-desist letter was sent, but not for the truth of any matter asserted within it.  *See, e.g.*, *FullSend, Inc. v. Nelk, Inc.*, No. 21-cv-05639 (PKC) (RML), 2023 WL 2710593, at *4 (E.D.N.Y. Mar. 30, 2023) (taking judicial notice of cease-and-desist letters on motion to dismiss).

motion, do not reveal any basis upon which such relief may be granted").

The Court understands that Nano may be frustrated that Murchinson and Anson have "felt free to time [their] disclosures to suit [their] own purposes" rather than in accordance with what they deem to be the requirements of the law.  *E.ON AG II*, 2007 WL 316874, at *9. However, "a statutory provision is not necessarily rendered toothless for lack of a particular sanction."  *CSX Corp.*, 654 F.3d at 287.  This lawsuit has, in essence, achieved the goals of Section 13(d) by alerting the public to the pertinent information about Defendants.  To the extent that untimely disclosures have harmed investors in their purchasing or selling of Nano's ADSs, investors have an adequate remedy at law.  Section 13(d) does not require more.  Accordingly, Plaintiff's Section 13(d) claims against Murchinson and Anson are dismissed as moot.

### III. Counts III, IV, and V (State Claims)

A district court "may decline to exercise supplemental jurisdiction" where it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Courts consider the "traditional 'values of judicial economy, convenience, fairness, and comity.'"  *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Generally, where "all federal-law claims are eliminated before trial, the balance of the factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Cohill*, 484 U.S. at 350 n.7; *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well.").

Here, the balance of factors weighs in favor of declining supplemental jurisdiction. Although the parties have submitted substantial filings in connection with the pending motions, the case is only at a nascent stage.  No discovery has occurred, nor has the initial pretrial

conference taken place.  Moreover, the parties are litigating similar issues in other proceedings that predate this case.  *See* Am. Compl. ¶ 107; June Tr. at 7:9-11.  Accordingly, because the Court dismisses Plaintiff's Section 13(d) federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's non-federal claims.  *See, e.g.*, *Cartica*, 50 F. Supp. 3d. at 496-97; *Taro*, 2010 WL 2835548, at *17-18.

## IV. Leave to Amend

Rule 15(a) provides that courts "should freely give leave [to amend] when justice so requires."  Nonetheless, "it is within the sound discretion of the district court to grant or deny leave to amend."  *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  Leave "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party."  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008).  To seek leave to amend, a plaintiff must at least "provide some indication of the substance of the contemplated amendment before a court could entertain the request."  *Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*, 52 F. Supp. 3d 601, 624 (S.D.N.Y. 2014); *see TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint.); *Gallop v. Cheney*, 642 F.3d 364, 369-70 (2d Cir. 2011) (holding that district court did not err by dismissing claim with prejudice "in the absence of any indication that [plaintiff] could – or would – provide additional allegations that might lead to a different result").

Here, in two sentences at the end of its opposition to Murchinson and Anson's initial motion to dismiss, Plaintiff stated that it is permitted to amend the Complaint as a matter of right.

*See* M&A Opp.1 at 30.  Plaintiff subsequently did so, filing the Amended Complaint after the initial motions to dismiss had been fully briefed.  Plaintiff has not requested leave to amend the Amended Complaint.  Plaintiff has provided no indication of the substance of any hypothetical amendment.  Nor has Plaintiff indicated how repleading would change the outcome of a motion to dismiss a second amended complaint.  Accordingly, Plaintiff's Section 13(d) claims are dismissed with prejudice.  *See, e.g.*, *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 848 (2d Cir. 2022) (concluding there was "no error or abuse of discretion in the District Court's dismissal of Felder's complaint with prejudice, as Felder did not request leave to re-amend"); *Chechele*, 819 F. Supp. 2d at 347-48 (denying leave to amend because plaintiff did not indicate how re-pleading would ameliorate pleading of "group" status under Section 13(d)); *Lowinger*, 43 F. Supp. 3d at 379 ("As Plaintiff has not identified any new facts or allegations that would permit survival of his [securities] claim or how an amended complaint may differ from the Complaint, Plaintiff's motion for leave to amend is denied.); *Forward Indus., Inc.*, 2014 WL 6901137, at *4 (dismissing Section 13(d) claims without leave to amend because the plaintiff failed to offer "any basis to find that the defects in the present Complaint could be cured through amendment").

Because the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims rather than decide them on the merits, Defendants' request that dismissal of these claims be with prejudice is denied and the claims are instead dismissed without prejudice.  *See Pavone v. Puglisi*, 353 F. App'x 622, 626 (2d Cir. 2009) ("[I]f state claims are dismissed because the district court does not exercise supplemental jurisdiction, such claims should be dismissed without prejudice." (citing *Chanayil v. Gulati*, 169 F.3d 168, 171-72 (2d Cir. 1999))).

**CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss the Amended Complaint are

GRANTED in part and DENIED in part; Defendants' motions to dismiss the Complaint are

DENIED as moot; and Plaintiff's preliminary injunction motion is DENIED as moot.

Accordingly, Plaintiff's federal claims are dismissed with prejudice and state claims are

dismissed without prejudice. The Clerk of Court is respectfully directed to CLOSE the case.

Dated:  July 10, 2023
      New York, New York

                                  SO ORDERED.

                                  JENNIFER L. ROCHON
                                  United States District Judge